IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM ROWELL | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| v. | ) | FILED: MAY 02, 2008 |
| | ) | 08CV2517        TC |
| FRANCONIA MINERALS CORPORATION | ) | JUDGE CASTILLO |
| a foreign corporation | ) | MAGISTRATE JUDGE BROWN |
| Defendant. | ) | |
| | ) | |

## NOTICE OF REMOVAL

Defendant, Franconia Minerals Corporation (hereafter "Franconia") hereby removes the above-described action pursuant to 28 USC §§ 1332, 1441 and 1446 from the Circuit Court of Cook County, Illinois (Case No. 2008 L 3944) to the Northern District of Illinois, Eastern Division on the following grounds:

**I.**     **Removal is Timely**

1.     The above-entitled action was commenced in Illinois State Court.  This Notice of Removal was filed less than 30 days from the receipt by the Defendant of the Complaint.  Attached hereto as Exhibit A are the pleadings received by Defendant in this action.

**II.**     **Removal is Proper Because the Court Has Subject Matter Jurisdiction to 28 USC § 1332 and 1441**

2.     There is complete diversity of citizenship between the parties and jurisdiction is appropriate in this Court pursuant to 28 USC §§1332(a)(1) and 1332(a)(2). According to the Complaint, Plaintiff is now and at the time this action was commenced a Citizen of the State of Illinois.  Franconia is foreign corporation organized and existing

under the laws of Canada, with its principal place of business located in the State of Washington. Therefore, Franconia is a Citizen of Canada and Washington.

3.    The amount in controversy requirement is also satisfied. It is apparent from the face of the Complaint that Plaintiff seeks recovery of an amount in excess of $75,000.00 exclusive of costs and interest. Plaintiff's Complaint expressly seeks "204,443.50, plus interest and costs." The Court in removal actions "determines the amount in controversy by merely looking at plaintiff's state court complaint." *Shaw v. Dow Brands, Inc.*, 994 F.2d 364, 366 (7th Cir. 1993); *See also Herremans v. Carrera Designs, Inc.*, 157 F.3d 1118, 1121 (7th Cir. 1998)("The test for whether a case satisfies the amount in controversy requirement is whether the complaint makes a good-faith claim for the amount, not whether the plaintiff is actually entitled to such an amount."); *NLFC, Inc. v. Devcom Mid-America, Inc.*, 45 F.3d 231, 237 (7th Cir. 1995)("Generally, the amount in controversy claimed by plaintiff in good faith will be determinative on issue of jurisdictional amount, unless it appears to legal certainty that claim is for less than that required by rule."); *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Wilkins-Lowe & Co., Inc.*, 29 F.3d 337, 339 (7th Cir. 1994) ("The sum claimed by the plaintiff, of course, controls the determination of jurisdictional amount if the claim is apparently made in good faith."); 16 Moore's Federal Practice § 107.14[2][g][iv] (Matthew Bender 3d ed.) (In the removal context, defendant's burden of proving that the amount in controversy requirement is satisfied if the plaintiff claims a sum greater than the jurisdictional requirement.)

4.    Defendant will give written notice of this filing as is required by 28 USC §1446(d), including upon the Plaintiff and the Circuit Court of Cook County.

WHEREFORE, Defendant respectfully requests that this matter be removed to the Northern District of Illinois, Eastern Division.

Dated May 2, 2008                    FRANCONIA MINERALS CORPORATION


By:   /s/ David J. Fish
                    One of its Attorneys

David J. Fish
THE FISH LAW FIRM, P.C.
1770 N. Park Street, Suite 202
Naperville, IL 60563
(630) 355-7590

## CERTIFICATE OF SERVICE

The undersigned being first duly sworn on oath deposes and says that he/she caused to be served the attached **Notice of Removal** on the following party via First Class Mail and electronic mail as indicated on the 2nd day of May, 2008:

Keith L. Davidson
Law Offices of Keith L. Davidson
Two North LaSalle Street, Suite 1600
Chicago, IL 60602

By:  /s/ David J. Fish_____
One of its Attorneys

David J. Fish
THE FISH LAW FIRM, P.C.
1770 N. Park Street, Suite 202
Naperville, IL 60563
(630) 355-7590

08CV2517          TC
JUDGE CASTILLO
MAGISTRATE JUDGE BROWN

# EXHIBIT A

STATE OF ILLINOIS   )
                   ) SS:
COUNTY OF COOK   )

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| WILLIAM ROWELL | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **JURY DEMAND** |
| v. | ) | |
| | ) | No. |
| FRANCONIA MINERALS CORPORATION, | ) | 2008L003944 |
| a foreign corporation | ) | CALENDAR/ROOM W |
| | ) | TIME 00:00 |
| Defendant | ) | Breach of Contract |
| | ) | |

## COMPLAINT AT LAW

Now comes the plaintiff, WILLIAM ROWELL ("ROWELL"), by his attorney, Keith L.

Davidson, and, complaining of a breach of written contract by defendant FRANCONIA MINERALS

CORPORATION ("FRANCONIA"), states as follows:

### THE PARTIES

1.     At all times pertinent hereto, plaintiff ROWELL was and he still is a resident of the

City of Lake Forest, Lake County, Illinois, and was engaged in the business of providing mineral

exploration geological consulting and advising services.

2.     At all times pertinent hereto, defendant FRANCONIA was and it still is a foreign

corporation, engaged in the business of mineral exploration, and was and is incorporated under the

laws of Canada and the Province of Alberta, with its headquarters in the city of Spokane, Spokane

County, Washington, U.S.A.

-1-

## THE CONTRACTUAL AGREEMENTS BETWEEN THE PARTIES

3.      On November 1, 2001, ROWELL and FRANCONIA entered into an agreement entitled as the "CONSULTING AGREEMENT" (Exhibit "1"), under which ROWELL was to provide geological consulting services to FRANCONIA on terms set forth therein.    The CONSULTING AGREEMENT was an adhesion contract, drafted solely by FRANCONIA and tendered to ROWELL in Lake Forest, Illinois on a take it or leave it basis.  ROWELL signed the CONSULTING AGREEMENT in Lake Forest, Illinois and Brian Gavin, FRANCONIA's president, signed it for FRANCONIA at its headquarters in Spokane, Washington.

4.      Paragraph 2 of the CONSULTING AGREEMENT provided that ROWELL was to devote such time, attention, and energy to FRANCONIA's affairs to perform his duties under the CONSULTING AGREEMENT and render such geological consulting and advising services to FRANCONIA "as shall be mutually agreed upon" by ROWELL and FRANCONIA.

5.      Paragraph 6 of the CONSULTING AGREEMENT provided that ROWELL was to work as an independent contractor and that FRANCONIA would compensate ROWELL by paying him a consulting fee on a per diem basis (or, on the basis of the proportion of a per diem fee commensurate with the proportion of a day's work), and by reimbursing his reasonable expenses for the performance of his services.  It further provided that:

> "During the term of this Agreement the Consultant shall be entitled to participate in any benefit plans adopted by the Corporation for the general and overall benefit of all employees and/or for key Consultants of the Corporation such as health care, life insurance, disability, stock option plans, tax, legal and financial planning services, pension, profit sharing and savings."

6.      Paragraph 8 of the CONSULTING AGREEMENT provided that FRANCONIA was entitled to terminate ROWELL with good cause on ten (10) days written notice or without good

cause on thirty (30) days written notice. It further provided that, if FRANCONIA terminated ROWELL with good cause, ROWELL would be entitled to no severance compensation but that, if FRANCONIA terminated Rowell without good cause, it would pay ROWELL a specific sum in US dollars depending on the date of termination, which sum, after December 31, 2002, would be U.S. $50,000, and that FRANCONIA would cancel, by payment of additional specified compensation, any previously issued FRANCONIA stock options ROWELL held that were not exercised within thirty (30) days of ROWELL's termination. It further provided that ROWELL may, without cause, terminate this agreement effective thirty (30) days after written notice to FRANCONIA. It further provided that, if ROWELL "resigned or otherwise terminated this contract," he was to receive no severance compensation.

      7.      Paragraph 9 of the CONSULTING AGREEMENT provided, among other things, that it was to be governed by the laws of the state of Washington; that it constituted the entire understanding between the parties; and that any supplement or amendment to it needed to be written and signed by the parties.

      8.      FRANCONIA adopted an AMENDED STOCK OPTION plan on May 27, 2004 for the general and overall benefit of all employees and key consultants (Exhibit "2"). Subsequently, FRANCONIA entered three successive stock option agreements with and specific to ROWELL. Each was entitled "DIRECTOR AND CONSULTANT STOCK OPTION AGREEMENT." Their respective dates were August 19, 2004 (Exhibit "3"), April 15, 2005 (Exhibit "4"), and November 23, 2006 (Exhibit "5"), and they differed only in respect to the amount and price of the stock and the expiration date of the option granted by each said agreement. FRANCONIA then adopted another AMENDED STOCK OPTION PLAN, entitled "SCHEDULE B," on August 17, 2007 and March 19, 2008, for the general and overall benefit of all employees and key consultants (Exhibit "6").

9.　　The May 27, 2004 AMENDED STOCK OPTION PLAN (Exhibit "2") provided, in paragraphs 7 *et seq*, that consultants, among others, were eligible to participate in the plan; and that FRANCONIA's Board shall determine to whom options shall be granted and on what terms and in what amount of shares. It further provided, in paragraph 11, that, if a participant ceased to be a consultant, he may exercise his option to the extent he was entitled to exercise it at the date of cessation but may do so only, within the lesser period of time after such cessation, between the time stipulated in the agreement evidencing the option and a maximum of one year. It further provided, in paragraph 24, that the plan was to be governed by and construed in accordance with the laws of Canada and the Province of Alberta.

10.　　The August 19, 2004. "DIRECTOR AND CONSULTANT STOCK OPTION AGREEMENT" (Exhibit "3") recited that, whereas on August 19, 2004, FRANCONIA's had granted ROWELL an option to purchase an aggregate of THREE HUNDRED FIFTY THOUSAND (350,000) shares without par value of its authorized uninsured share capital; and it provided, in paragraph 1(d), that the expiration date on the option was August 19, 2009. It further provided, in paragraph 2.1, that said option was irrevocable and that the option price would be $0.08 (Cdn.) per share. It further provided, in paragraph 3.2, as follows:

"Termination of Position:

(a)　　Subject to Clause 3.2(b) hereof, if subsequent to the Option Date and prior to the Expiration Date, the Optionee's position as a director or consultant of the Corporation and/or its subsidiary, as the case may be, is terminated for any reason other than the death or disability of the Optionee, the Share Option may be exercised in respect of any outstanding Option Shares for which the Share Option was capable of exercise prior to the termination (but this shall not include any Option Shares for which the defined period for exercise of the Option has not yet started at the effective date of the termination) during the ninety (90) day period following the date on which the Optionee's position is terminated, and upon the expiry of such ninety (90) day period, the Share Option shall expire.

(b)　　If the Optionee's position as a director or consultant of the Corporation and/or its

-4-

> subsidiary is terminated by reason of default on the part of the Optionee, the Optionee's rights under the Share Option shall terminate and shall be of no further force or effect whatsoever as to such of the Option Shares in respect of which the Share Option has not then been exercised."

It further provided, in paragraph 7.1, that the share option may be exercised by delivery of written notice thereof and by tendering the payment therefor in cash or by certified check to FRANCONIA at its head office, in Spokane Washington, and that the option shall be deemed to have been exercised upon delivery of said notice and said tender of payment. It further provided, in paragraph 9.6, that the agreement shall be construed in accordance with the laws of the Province of Alberta and the federal laws of Canada applicable therein.

11.    The April 15, 2005 DIRECTOR AND CONSULTANT STOCK OPTION AGREEMENT (Exhibit "4," except for the last page, of which plaintiff does not presently have a copy) was identical to the August 19, 2004 DIRECTOR AND CONSULTANT STOCK OPTION AGREEMENT (Exhibit "3") except that it provided that ROWELL had the option to purchase ONE HUNDRED FORTY THOUSAND (140,000) such shares at a price of $0.42 (Cdn.) per share until the expiration date of April 15, 2010.

12.    The November 23, 2006 DIRECTOR AND CONSULTANT STOCK OPTION AGREEMENT (Exhibit "5") was also identical to the April 15, 2005 DIRECTOR AND CONSULTANT STOCK OPTION AGREEMENT (Exhibits "3") except that it provided that ROWELL had the option to purchase 65,000 such shares at $1.45 (Cdn.) per share until an expiration date of November 23, 2011.

13.    The AMENDED STOCK OPTION PLAN, SCHEDULE B, of August 17, 2007 and March 19, 2008 (Exhibit "6") made no changes to the May 27, 2004 AMENDED STOCK OPTION PLAN (Exhibit "1") that are material or pertinent to this action.

-5-

## ROWELL'S COMPLIANCE WITH AND FRANCONIA'S BREACH OF CONTRACTUAL OBLIGATIONS

14.     Pursuant to the CONSULTING AGREEMENT, ROWELL and FRANCONIA mutually agreed upon various geological and advising services ROWELL would perform for FRANCONIA in the United States, which included services that, as mutually agreed upon, ROWELL rendered primarily out of his home in Lake Forest, Illinois and in Minnesota and to a lesser extent in Nevada.

15.     ROWELL performed all obligations on his part to be performed under the CONSULTING AGREEMENT, including but not limited to all geological and advising services that he and FRANCONIA had mutually agreed that he was to perform.

16.     In reliance on his CONSULTING AGREEMENT with FRANCONIA and to be able and available to perform geological and advising services for FRANCONIA that had been or might be mutually agreed upon pursuant to the CONSULTING AGREEMENT, ROWELL declined other offers and opportunities to perform geological and consulting services for other existing or prospective clients.

17.     In May, 2007, through his broker, ROWELL exercised his option to purchase 140,000 shares of FRANCONIA pursuant to the April 15, 2005 DIRECTOR AND CONSULTANT STOCK OPTION AGREEMENT (Exhibit "4").

18.     In February, 2008, ROWELL sought to exercise, through his broker, his option to purchase 70,000 shares of FRANCONIA stock at the price of $0.40 Cnd. per share pursuant to the August 19, 2004 DIRECTOR AND CONSULTANT STOCK OPTION AGREEMENT (Exhibit "3"), but FRANCONIA refused to allow ROWELL to make the purchase and informed

-6-

ROWELL's broker that ROWELL had quit the company.

19.    On February 28, 2008 ROWELL sent a letter by registered U.S. mail to

FRANCONIA's Spokane, Washington headquarters to exercise his option to purchase 70,000

shares of FRANCONIA stock at the price of $0.40 Cnd. per share pursuant to the August 19,

2004 DIRECTOR AND CONSULTANT STOCK OPTION AGREEMENT (Exhibit "3").  A 5:1

reverse split in FRANCONIA's stock had taken place in December, 2004, thereby reducing

ROWELL's option to purchase the 350,000 shares to an option to purchase 70,000 shares and

raising the price by the same ratio, *i.e.* 5:1, to $0.40 Cnd. per share under said agreement.  In

response to said letter, ROWELL received by facsimile, on March 10, 2008, a letter dated March

6, 2008 from FRANCONIA's president, Brian Gavin (Exhibit "7"), informing him that he was

not entitled to exercise any options to purchase FRANCONIA stock under either the August 19,

2004 or November 23, 2006 DIRECTOR AND CONSULTANT STOCK OPTION

AGREEMENTS because, according to Gavin's letter, ROWELL had advised FRANCONIA on

March 4, 2007, that he was terminating his services to FRANCONIA, more than 90 days from

the end of the 30 day termination period called for in section 8 of the CONSULTING

AGREEMENT.

20.    At no time to and including the present did ROWELL, orally or in writing, ever

resign or otherwise terminate his position as a consultant to FRANCONIA under the

CONSULTING AGREEMENT nor default on any obligations resting upon him under the

CONSULTING AGREEMENT.

21.    At no time to and including the present did FRANCONIA ever terminate

ROWELL in accordance with the terms of the CONSULTING AGREEMENT or afford him the

opportunity to exercise any of his stock options following any such termination.

-7-

22.    FRANCONIA breached the CONSULTING AGREEMENT by refusing to permit ROWELL to exercise his stock option pursuant to the CONSULTING AGREEMENT and repudiated the CONSULTING AGREEMENT by so doing and by falsely asserting that ROWELL had terminated his position with FRANCONIA.

<u>ROWELL'S DAMAGES</u>

23.    On February 28, 2008, ROWELL sought by letter to exercise his option to purchase 70,000 shares of FRANCONIA's stock at a price of $0.40 Cnd. per share, or a total purchase price of $28,000 Cnd.  On said date, the price of a share of FRANCONIA stock on the Toronto stock exchange was $1.85 Cnd. per share, whereby the total price to purchase 70,000 shares of it on the Toronto stock exchange would have been $129,500 Cnd.  FRANCONIA's stock was not sold on any U.S. stock exchange.  The Toronto stock exchange was the only market reasonably accessible to ROWELL to purchase FRANCONIA stock or, if he had been able to purchase it from FRANCONIA on said date, to sell it on said date.  Thereby, the loss to ROWELL proximately resulting from FRANCONIA's refusal to honor his stock option totaled $101,500 Cnd., which at said time, based on the then prevailing exchange rate, $1 Cnd.=$1.029 UDS, was equal to $104,443.50 USD.

24.    FRANCONIA has also failed and refused to pay ROWELL the US $50,000 in severance pay which he is entitled to be paid, pursuant to paragraph 8 of the CONSULTING AGREEMENT, by virtue of FRANCONIA's repudiation of the CONSULTING AGREEMENT.

25.    ROWELL also suffered consequential damages, amounting to approximately $50,000 USD, as a result of his having declined or not sought other business opportunities while the CONSULTING AGREEMENT was in force and effect, including but not limited to

-8-

additional work in Argentina for another client, Viceroy Exploration, for whom he was already

doing work in Argentina.


WHEREFORE, plaintiff WILLIAM ROWELL seeks to recover money damages from

FRANCONIA MINERALS CORPORATION in the amount of $204,443.50, plus interest and

costs.


_____
                                        Keith L. Davidson

**Law Offices of Keith L. Davidson**
Two North LaSalle Street
Suite 1600
Chicago, Illinois 60602
312-419-0544
Atty. No. 22561

-9-

EXHIBIT

1

## CONSULTING AGREEMENT

This Consulting Agreement (hereinafter referred to as the "Agreement'"), effective January 1, 2001, is made by and between Franconia Minerals Inc., an Alberta, Canada Corporation having offices at 1600 Canada Place 407-2nd Street S.W., Calgary, ALBERTA T2P 2Y3, CANADA and other corporations owned or controlled by it (referred to as the "Company"), and William F. Rowell, 955 N Ringwood Rd, Lake Forest, IL 60045, (hereinafter referred to as the "Consultant").

WHEREAS, the Consultant is willing and able to provide consulting services in geology, mineral exploration related matters, and

WHEREAS, the Company desires to obtain said services from Consultant,

NOW THEREFORE, in consideration of the conditions and mutual covenants hereinafter set forth, the parties agree as follows:

### 1.    Term of Agreement

This agreement shall continue in effect until December 31, 2001, and shall automatically be renewed annually, unless sooner terminated as provided in Section 8 hereof.

### 2.    Scope of Services

The Consultant shall, devote such time, attention and energy to the affairs of Company to perform his duties hereunder and render such geological consulting and advisory services to Company as shall be mutually agreed upon by Consultant and its President.

### 3.    Standards of Performance

All services hereunder shall be performed by Consultant in a thorough and efficient manner, with due care, and in accordance with standard practices in geology.

### 4.    Confidentiality, Conflict of Interest

a) Consultant agrees to furnish Company, at times and to the extent directed by the Company or its representative, with reports of progress and with all data and information relating to the services performed by Consultant hereunder. All such reports, data, and information shall become the sole property of Company and shall be delivered to Company from time to time as scheduled or requested.

b) Company and Consultant acknowledge that the services to be performed by Consultant hereunder are such that Consultant may acquire, develop, or produce information or technical data relating to Company's methods, mineral exploration programs, mineral properties, and business practices. Consultant agrees that during the term of this Agreement, and for a period of one year thereafter, Consultant will treat such information or technical data, including that delivered to Company by Consultant, as secret and confidential and will not, without the prior written consent of Company, directly or indirectly use or disclose to a third party such information or technical data, whether acquired, developed, or produced by Consultant in the performance of the services under this Agreement. Company agrees that information or technical data that is of public knowledge or was known to Consultant prior to

Founder *Franconia Minerals Inc.*        *Consulting Agreement - Page 1*

Consultant obtaining the same through performance of the services hereunder shall not be considered as confidential.

c) Consultant agrees that for a period of one year after the term of this Agreement, Consultant will not acquire nor seek to acquire, directly or indirectly, any interest in mineral properties using confidential information acquired in the performance of the services under this Agreement without the prior written consent of Company.

d) Consultant recognizes that the Company may, from time to time, enter into confidentiality agreements which may restrict its activities and those of its Consultants, employees and agents for a period longer than that contemplated in d) above. In this event the Consultant will be bound by the terms of any agreement with a longer term.

e) Consultant represents to Company that there is no present conflict of interest relating to *Consultant's acceptance of this Agreement or to the services to be performed hereunder and agrees to* promptly notify Company in the event any conflict of interest develops during the term of this Agreement.

## 5.    Indemnity and Insurance

Consultant agrees to indemnify, defend, and save harmless Company from any and all liability claims for injury or death to any persons or for damage to or loss of property arising out of, or alleged to have arisen out of, any breach or default by Consultant of the terms and conditions of this Agreement, any negligent acts or omissions by Consultant, and any civil or criminal violations or breaches of statutes by Consultant.

## 6.    Payment and Compensation

In performing the services under this Contract, Consultant shall act as an independent contractor and shall not bind or commit Company in any manner except as expressly authorized by Company. Unless acting as an Officer or Director of the Company, in the performance of the services hereunder Consultant shall make clear in all dealings with third parties that Consultant is acting strictly in the capacity of a contractor.

For performance of the services hereunder, Company agrees to pay Consultant a consulting fee of $450.00 (US) per day. In the event that partial days are worked, this daily rate shall be pro-rated on an eight-hour per day basis. Consultant agrees that all income, social security, and other taxes pertaining to fees hereunder and any pensions or medical and life insurance are Consultant's sole responsibility.

During the term of this Agreement the Consultant shall be entitled to participate in any benefit plans adopted by the Corporation for the general and overall benefit of all employees and/or for key Consultants of the Corporation such as health care, life insurance, disability, stock option plans, tax, legal and financial planning services, pension, profit sharing and savings.

Company agrees to reimburse Consultant, at cost, for all reasonable and necessary expenses incurred by Consultant in relation to Consultant's performance of services under this Agreement.

Consultant agrees to invoice Company, on or about the first day of each month and in a format acceptable to Company, for fees and expense reimbursement due Consultant. Invoices shall be supported by receipts for expenses. Upon acceptance, Company shall pay such invoices within thirty days at Consultant's mailing address or at such address as Consultant indicates.

**7.    Notices, Representatives**

Written notices made pursuant to this Agreement shall be delivered personally or by courier or mail (return receipt provided) to the addresses stated above. Either party may notify the other of a change in its address for notice. Other notices or communications permitted or required by this Agreement may be made verbally as appropriate.

**8.    Termination**

1) With Cause. The Corporation, as represented by its President, may terminate this Agreement ten (10) days after written notice to Consultant for "Good Cause," which shall mean any one or more of the following: (1) Consultant's willful, material and irreparable breach of this Agreement; (2) Consultant's gross negligence in the performance or intentional nonperformance (continuing for ten (10) days after receipt of written notice of need to cure) of any of Consultant's material duties and responsibilities hereunder; (3) Consultant's willful dishonesty, fraud or misconduct with respect to the business or affairs of the Corporation which materially and adversely affects the operations or reputation of the Corporation; (4) Consultant's conviction of a felony crime or gross misdemeanor; (5) confirmed positive illegal drug test result; or 6) bankruptcy, death or mental or physical inability to perform of any of Consultant's material duties and responsibilities hereunder. In the event of a termination for Good Cause, as enumerated above, Consultant shall have no right to any severance compensation.

2) Without Good Cause. At any time after the commencement of this Agreement, Consultant may, without cause, terminate this Agreement effective thirty (30) days after written notice is provided to the Corporation. Consultant may be terminated without Good Cause by the Corporation, as represented by its President, provided that the Consultant receives at least one (1) month written notice. In the event that Consultant is terminated without Good Cause during the Term:

a) Consultant shall receive as severance pay from the Company, within 30 days of the date of termination the amount of US$25,000.00 if the termination date is on or before December 31, 2001; or, the amount of US$37,500.00 if the termination date is after December 31, 2001 and on or before December 31, 2002; or, the amount of US$50,000.00 if the termination date is after December 31, 2002; and,

b) The Company will cancel, by payment to the Consultant of an amount equal to the difference between the exercise price of the options and the average closing price of the common shares on the relevant stock exchange or trading platform during the previous thirty days, any previously issued Franconia Minerals Corporation share options held by the Consultant which are not exercised within thirty days of the date of termination.

If Consultant resigns or otherwise terminates this contract, rather than the Corporation terminating this contract pursuant to this paragraph 8, Consultant shall receive no severance compensation.

**9.    General Conditions**

a) It is hereby agreed that this Agreement shall be governed by the laws of the state of Washington.

Founder *Franconia Minerals Inc.*        *Consulting Agreement - Page 3*

b) This Agreement constitutes the entire understanding between the parties and terminates all prior agreements between Company and Consultant, if any. Any supplement or amendment to this Agreement, to be effective, shall be written and signed by Consultant and Company.

c) This Agreement and the rights and duties hereunder may not be assigned, transferred, or delegated by Consultant without prior written consent of Company.

IN WITNESS WHEREOF, this Consulting Agreement has been executed as of June 15, 2001.

CONSULTANT:

_William F. Rowell_
William F. Rowell
Tax ID # 0297 2 0439

FRANCONIA MINERALS INC:

_Brian Gavin_
Brian Gavin
President
Franconia Minerals Corporation

EXHIBIT

2

Bloomberg No. 8118

# FRANCONIA MINERALS CORPORATION

## AMENDED   STOCK OPTION PLAN

**May 27, 2004**

1.      **Purpose**

The purpose of the Stock Option Plan (the "Plan") of Franconia Minerals Corporation, a corporation incorporated under the *Business Corporations Act* (Alberta) (the "Corporation"), is to advance the interests of the Corporation or any of its subsidiaries or affiliates by encouraging the directors, officers, employees and consultants of the Corporation or any of its subsidiaries or affiliates to acquire shares in the Corporation, thereby increasing their proprietary interest in the Corporation, encouraging them to remain associated with the Corporation or any of its subsidiaries or affiliates and furnishing them with additional incentive in their efforts on behalf of the Corporation or any of its subsidiaries or affiliates in the conduct of their affairs.

2.      **Administration and Granting of Options**

The Plan shall be administered by the board of directors of the Corporation (the "Board"). A majority of the Board shall constitute a quorum. and the acts of a majority of the Board present at any meeting at which a quorum is present, or acts unanimously approved in writing, shall be the acts of the directors.

Subject to the provisions of the Plan, the Board shall have authority to construe and interpret the Plan and all option agreements entered into thereunder, to define the terms used in the Plan and in all option agreements entered into thereunder. to prescribe, amend and rescind rules and regulations relating to the Plan and to make all other determinations necessary or advisable for the administration of the Plan. All determinations and interpretations made by the Board shall be binding and conclusive on all participants in the Plan and on their legal personal representatives and beneficiaries.

Each option granted hereunder shall be evidenced by an agreement, signed on behalf of the Corporation and by the optionee. in such form as the directors shall approve. Each such agreement shall recite that it is subject to the provisions of this Plan.

3.      **Shares Subject to Plan**

Subject to adjustment as provided in Section 15 hereof, the shares to be offered under the Plan shall consist of shares of the Corporation's authorized but unissued common shares.   The aggregate number of shares to be delivered upon the exercise of all options granted under the Plan shall not exceed 20% of the Corporation's issued and outstanding common shares from time to time, to a maximum of 5,000,000 shares. If any option granted hereunder shall be cancelled. expire or terminate for any reason without having been exercised in full, the unpurchased shares subject thereto shall again be available for the purpose of this Plan.

4.      **Number of Optioned Shares**

The number of shares subject to an option to a Participant, as hereinafter defined, shall be determined by the Board, but no Participant, as hereinafter defined, upon the Corporation becoming listed

{C0196692.DOC:1} P:\clients\36970\0004\C0196692.DOC        1

on any stock exchange, shall be granted an option which exceeds the maximum number of shares permitted by any stock exchange on which the common shares are then listed or other regulatory body having jurisdiction.

5.    **Vesting**

The Board may, in its sole discretion, determine the time during which options shall vest and the method of vesting, or that no vesting restriction shall exist.

6.    **Maintenance of Sufficient Capital**

The Corporation shall at all times during the term of the Plan reserve and keep available such numbers of shares as will be sufficient to satisfy the requirements of the Plan.

7.    **Participation**

Directors, officers, management, consultants and employees of the Corporation, and of its subsidiary and affiliated companies and employees of a person or company which provides management services to the Corporation or its subsidiaries or affiliates ("Management Company Employees"), shall be eligible for selection to participate in the Plan (such persons hereinafter collectively referred to as "Participants"). Participants may elect to hold options granted to them in a personal holding company of the Participant, the shares of which are held by the Participant, the Participant's spouse, minor children and/or minor grandchildren and such entity shall be bound by the Plan in the same manner as if the options were held directly by the Participant. Subject to the terms hereof, the Board shall determine to whom options shall be granted, the terms and provisions of the respective option agreements, the time or times at which such options shall be granted, and the number of shares to be subject to each option. In the case of employees and consultants or Management Company Employees, the option agreements to which they are party must contain a representation of the Corporation that the employee, consultant or Management Company Employee, as the case may be, is a bona fide employee, consultant or Management Company Employee of the Corporation or its subsidiary. An individual who has been granted an option may, if he is otherwise eligible, and if permitted under the policies of the stock exchange or stock exchanges on which the shares of the Corporation are to be listed, be granted an additional option or options if the directors shall so determine.

8.    **Exercise Price**

The exercise price of the shares covered by each option shall be determined by the directors, however, if the Corporation's shares are listed on a stock exchange or quoted, the exercise price shall be not less than the closing price of the Corporation's shares on the stock exchange or stock exchanges on which the shares of the Corporation are listed on the last trading day immediately preceding the day on which the stock exchange is notified of the proposed issuance of option, less any discounts permitted by the policy or policies of such stock exchange or stock exchanges. The exercise price shall not be less than the price permitted by any stock exchange on which the common shares are then listed or other regulatory body having jurisdiction.

9.    **Duration of Option**

Each option and all rights thereunder shall be expressed to expire on the date set out in the option agreements and shall be subject to earlier termination as provided in paragraphs 11 and 12.

10.    **Option Period, Consideration and Payment**

(a)    The option period shall be a period of time fixed by the Board, not to exceed the maximum period permitted by any stock exchange on which the common shares are then listed or other regulatory body having jurisdiction, provided that the option period shall be reduced with respect to any option as provided in Sections 11 and 12 covering cessation as a director, officer, employee, consultant or Management Company Employee of the Corporation or any of its subsidiaries or affiliated companies or death of the Participant.

(b)    Except as set forth in Sections 10(c), 11 and 12, no option may be exercised unless the Participant is at the time of such exercise a director, officer, employee, consultant or Management Company Employee of the Corporation or any of its subsidiaries or affiliates.

(c)    Notwithstanding any other provision to the contrary, an option granted to a consultant in connection with specific services provided or to be provided by that consultant shall be exercised only after the date of completion of such service and prior to 30 days following the date of completion of such service.

(d)    The exercise of any option will be contingent upon receipt by the Corporation at its head office of a written notice of exercise, specifying the number of shares with respect to which the option is being exercised, accompanied by cash payment, certified cheque or bank draft for the full purchase price of such shares with respect to which the option is exercised. No Participant or his legal representatives, legatees or distributees will be, or will be deemed to be, a holder of any shares subject to an option under this Plan, unless and until the certificates for such shares are issued to such persons under the terms of the Plan.

11.    **Ceasing To Be a Director, Officer, Employee or Consultant**

If a Participant shall cease to be a director, officer, employee, or consultant of the Corporation or of its subsidiary or affiliated company or a Management Company Employee, for any reason (other than death), he may exercise his option to the extent that he was entitled to exercise it at the date of such cessation, but may only do so within the period of time after such cessation being:

(a)    the lesser of the time stipulated in the agreement evidencing the option and a maximum of three years, for full time employees; or

(b)    the lesser of the time stipulated in the agreement evidencing the option and a maximum of one year, for other service providers including directors.

Nothing contained in the Plan, nor in any option granted pursuant to the Plan, shall as such confer upon any Participant any right with respect to continuance as a director, officer, manager, employee or consultant of the Corporation or of any affiliate.

12.    **Death of Participant**

In the event of the death of a Participant, the option previously granted to him shall be exercisable only within the period of time being:

{C0196692.DOC;1} P:\clients\36970\0004\C0196692.DOC        3

(a)  the lesser of the time stipulated in the agreement evidencing the option and a maximum of three years, for full time employees: or

(b)  the lesser of the time stipulated in the agreement evidencing the option and a maximum of one year, for other service providers including directors:

and then only:

(c)  by the person or persons to whom the Participant's rights under the option shall pass by the Participant's will or the laws of descent and distribution: and

(d)  if and to the extent that he was entitled to exercise the option at the date of his death.

13.  **Certain Limitations Regarding Incentive Stock Options Granted to U.S. Residents**

Incentive Stock Options ("ISOs") as defined in Section 422 of the U.S. Internal Revenue Code of 1986, as amended (the "Code") may be granted only to an individual who is an employee of the Corporation and shall be subject to the following limitations:

(a)  Exercise Price.  Determination of the option price per share for any stock option issued hereunder shall rest in the discretion of the Board, provided that the exercise price for any ISO shall not be less than the fair market value per share of the Corporation's shares at the time the option is granted and subject further to subparagraph (f) this Section 13.  For the purposes of this Plan, the fair market value of Corporation's shares ("Shares"), as of any date, shall be determined as follows:

(i)  If the Shares are listed on any established stock exchange or a national market system, its fair market value shall be the closing sales price for such Shares (or the closing bid, if no sales were reported), as quoted on such system or exchange, or the system or exchange with the greatest volume of trading in Shares, for the last market trading day prior to the time of determination;

(ii)  If the Shares are regularly quoted by a recognized securities dealer but selling prices are not reported, its fair market value shall be the mean between the high bid and low asked prices for the Shares for the last market trading day prior to the time of determination; or

(iii)  In the absence of an established market for the Shares, the fair market value thereof shall be determined in good faith by the Board.

(b)  Subject to the restrictions imposed on ISOs as contained in Section 13, the term of each option shall be established by the Board and, if not so established, shall be ten years from the date such ISO is granted.  The Board, in its discretion, may provide that an option shall be exercisable during such ten-year period or during any lesser period of time.

(c)  Nontransferability of ISOs.  No right or interest in any ISO granted under this Plan shall be assignable or transferable except upon the death of the option holder ("Optionee") pursuant to the terms of such Optionee's will or the laws of descent and distribution.

(d)    Termination of Employment, Disability and Death.

(1)    Termination. If the Optionee's relationship with the Corporation, its subsidiaries or affiliates shall terminate for any reason other than death or disability, the ISO may be exercised by the Optionee at any time prior to the expiration of three (3) months after the date of such termination of employment (unless by its terms the option sooner terminates or expires), but only if and to the extent the Optionee was entitled to exercise the option at the date of such termination.

(2)    Disability. If the Optionee's relationship with the Corporation, its subsidiaries or affiliates ceases as a result of the Optionee's disability (as herein defined), the ISO shall not terminate for a period of one (1) year after the date of such termination (unless by its terms the option sooner terminates or expires), but only if and to the extent the Optionee was entitled to exercise the option at the date of such cessation. For purposes of this paragraph, an Optionee will be considered to be disabled if the Optionee is unable to engage in any substantial gainful activity by reason of any medically determinable mental or physical impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

(3)    Death. If the Optionee's relationship with the Corporation, its subsidiaries or affiliates, ceases as a result of the death of the Optionee, the option shall be exercisable on or prior to the expiration of one (1) year after the date of such death (unless by its terms the option sooner terminates and expires), but only if and to the extent the Optionee was entitled to exercise the option at the date of such death and only by the Optionee's personal representative if then subject to administration as part of the Optionee's estate, or by the person or persons to whom such Optionee's rights under the option shall have passed by the Optionee's will or by the applicable laws of descent and distribution.

(e)    Limitation on Amount of Grants. To the extent that an Optionee is granted ISOs that in the aggregate (together with all other ISOs granted by the Corporation or its subsidiaries) entitle the Optionee to purchase, in any calendar year during which such options first become exercisable, stock of the Corporation, any subsidiary having a fair market value (determined as of the time of such options are granted) in excess of $100,000, such options in excess of the $100,000 threshold shall not be treated as ISOs, but shall be considered to be nonqualified stock options ("NSOs"). No limitation shall apply to NSOs.

(f)    Grants to Ten Percent Shareholders. Subject to the terms of this Plan, if ISOs may be granted to a person who, at the time the option is granted, owns more than ten percent (10%) of the total combined voting power of all classes of stock of the Corporation and any subsidiary only if: (i) the exercise price is at least 110 percent of the fair market value of the Shares at the time of grant, and (ii) the option is not exercisable more than five (5) years from the date of grant.

(g)    Shareholder Approval of Plan. Subject to the requirements of Code Section 422 with respect to ISOs, the terms, conditions and limitations of the Plan must be approved by the Corporation's shareholders within 12 months before or after the adoption of the Plan or any amendment or modification thereto. Any such amendment or modification of the Plan, however, shall not alter, impair or diminish the rights of any option previously granted under the Plan without the written consent of the option holder. Nor shall the Board modify or amend any outstanding ISO so as to specify a lower exercise price for the ISO.

(h)    Notice of Disposition    Any option which is issued as an ISO under this Plan, shall, notwithstanding any other provisions of this Plan or the option terms to the contrary, contain all of the terms, conditions, restrictions, rights and limitations required to be an Incentive Stock Option, and any

provision to the contrary shall be disregarded. In order to obtain certain tax benefits afforded to incentive stock options under Section 422 of the Code, the Optionee must hold the Shares issued upon the exercise of an ISO for a minimum of two (2) years after the date of grant of the ISO and one (1) year from the date of exercise. The Board may require an Optionee to give the Corporation prompt notice of any subsequent disposition of shares acquired on exercise of such ISO prior to the expiration of the above holding periods.

14.    **Rights of Optionee**

No person entitled to exercise an option shall have any of the rights or privileges of a shareholder of the Corporation in respect of any shares issuable upon exercise of such option until certificates representing such shares shall have been issued and delivered.

15.    **Proceeds from Sale of Shares**

The proceeds from sale of shares issued upon the exercise of options shall be added to the general funds of the Corporation and shall thereafter be used from time to time for such corporate purposes as the Board may determine and direct.

16.    **Adjustments**

If the outstanding shares of the Corporation are increased, decreased, changed into or exchanged for a different number or kind of shares of securities of the Corporation through re-organization, merger, re-capitalization, re-classification, stock dividend, subdivision or consolidation, an appropriate and proportionate adjustment shall be made in the maximum number or kind of shares as to which options may be granted under the Plan. A corresponding adjustment changing the number or kind of shares allocated to unexercised options or portions thereof, which shall have been granted prior to any such change, shall likewise be made. Any such adjustment in the outstanding options shall be made without change in the aggregate purchase price applicable to the unexercised portion of the option but with a corresponding adjustment in the price for each share or other unit of any security covered by the option.

Upon the liquidation or dissolution of the Corporation or upon a re-organization, merger or consolidation of the Corporation with one or more corporations as a result of which the Corporation is not the surviving corporation, or upon the sale of substantially all of the property or more than eighty (80%) percent of the then outstanding shares of the Corporation to another corporation, the Plan shall terminate, and any options theretofore granted hereunder shall terminate unless provision is made in writing in connection with such transaction for the continuance of the Plan and for the assumption of options theretofore granted, or the substitution for such options of new options covering the shares of a successor employer corporation, or a parent or subsidiary thereof, with appropriate adjustments as to number and kind of shares and prices, in which event the Plan and options theretofore granted shall continue in the manner and upon the terms so provided. If the Plan and unexercised options shall terminate pursuant to the foregoing sentence all persons then entitled to exercise an unexercised portion of options then outstanding shall have the right at such time immediately prior to consummation of the event which results in the termination of the Plan as the Corporation shall designate, to exercise their options to the full extent not theretofore exercised.

Adjustments under this Section shall be made by the Board whose determination as to what adjustments shall be made, and the extent thereof, shall be final, binding and conclusive. No fractional share shall be issued under the Plan on any such adjustment.

17.    **Transferability**

All benefits, rights and options accruing to any Participant in accordance with the terms and conditions of the Plan shall not be transferrable or assignable unless specifically provided herein. During the lifetime of a Participant any benefits, rights and options may only be exercised by the Participant.

18.    **Amendment and Termination of Plan**

Subject to applicable regulatory approval, the Board may, at any time, suspend or terminate the Plan. Subject to applicable regulatory approval, the board may also at any time amend or revise the terms of the Plan, PROVIDED that no such amendment or revision shall alter the terms of any options theretofore granted under the Plan.

19.    **Necessary Approvals**

The ability of the options to be exercised and the obligation of the Corporation to issue and deliver shares in accordance with the Plan is subject to any approvals which may be required from the shareholders of the Corporation, any regulatory authority or stock exchange having jurisdiction over the securities of the Corporation. If any shares cannot be issued to any Participant for whatever reason, the obligation of the Corporation to issue such shares shall terminate and any option exercise price paid to the Corporation will be returned to the Participant.

Options issued to residents of the United States may only be issued and subsequently exercised in conformity with the registration provisions of the *Securities Act of 1933*, as amended the rules and regulations thereto and the applicable state securities laws.

20.    **Creation of Share Option Schemes**

To comply with the requirements of UK Inland Revenue and other regulatory authorities, the Board has the authority to create and adopt share option schemes, which terms and conditions are within the scope of the provisions of the Plan, and grant stock options to directors, management, consultants, employees of the Corporation and of its subsidiary and affiliates and Management Company Employees pursuant to such schemes.

21.    **Plan not Exclusive**

The Plan is not intended to be, and shall not be deemed to be a substitute for any other deferred compensation or bonus plans of the Corporation (or any of its subsidiaries or affiliates) or any other plan, practice or arrangement for the payment of compensation or fringe benefits, that may now or hereafter be in effect for those eligible for stock options (as set forth in Section 7 hereof) generally or any group or class of those eligible for grants of stock options, and any such plan, practice or arrangement may be continued or authorised and payment thereunder made independently of the Plan.

22.    **Stock Exchange Rules**

The rules of any stock exchange or stock exchanges upon which the Corporation's shares are listed or other regulatory body having authority shall be applicable relative to options granted to Participants.

23. **Effective Date of Plan**

   The Plan has been adopted by the Board subject to the approval of any stock exchange on which the shares of the Corporation are to be listed or other regulatory body having jurisdiction and, if so approved, the Plan shall become effective upon such approvals being obtained.

24. **Interpretation**

   The Plan will be governed by and construed in accordance with the laws of Canada and of the Province of Alberta.



**EXHIBIT**

**3**

**THIS AGREEMENT** made as of the 19th day of August, 2004.

08CV2517          TC

JUDGE CASTILLO

MAGISTRATE JUDGE BROWN

**BETWEEN:**

> **WILLIAM ROWELL,** an individual resident in the City of Lake Forest, in the State of Illinois;
>
> (herein referred to as the "Optionee")
>
> - and -
>
> **FRANCONIA MINERALS CORPORATION,** a body corporate, having an office in the City of Spokane, in the State of Washington
>
> (herein referred to as the "Corporation")

### DIRECTOR AND CONSULTANT STOCK OPTION AGREEMENT (US)

**WHEREAS** the Corporation is incorporated under the laws of the Province of Alberta, having an authorized capital consisting of an unlimited number of common shares without nominal or par value and an unlimited number of Preferred Shares without nominal or par value;

**AND WHEREAS** the Optionee is either a director or a consultant of the Corporation or of a subsidiary corporation of the Corporation;

**AND WHEREAS** the Board has agreed to grant unto the Optionee, pursuant to the terms of the Stock Option Plan dated April 18, 2001, as amended (the "Plan"), an option to purchase an aggregate of **THREE HUNDRED FIFTY THOUSAND (350,000) SHARES** without par value of its authorized unissued share capital in consideration of the Optionee's ongoing services and contributions to the Corporation or to any of its subsidiaries or affiliates; and

**AND WHEREAS** the granting of such option to the Optionee was authorized by the Board effective August 19, 2004.

**NOW, THEREFORE THIS AGREEMENT WITNESSES** that in consideration of the premises and mutual covenants hereinafter set forth, and for other valuable consideration, the parties hereto have agreed as follows:

## ARTICLE 1
## DEFINITIONS

1.1    Definitions:

In this Agreement the following terms shall have the following meanings:

(a)    "Agreement", "herein", "hereto", "hereof" and similar expressions means this Agreement, and includes any Agreement amending this Agreement or any Agreement or instrument which is supplemental or ancillary hereof;

(b)    "Board" means the Board of Directors of the Corporation;

(c)    "Corporation" means Franconia Minerals Corporation and any successor or continuing corporation resulting from any form of corporate reorganization;

(d)    "Expiration Date" means August 19, 2009;

(e)    "Option Date" in respect of Share Option means the date of this Agreement;

(f)    "Option Shares" means the Shares the Optionee is entitled to purchase under a Share Option;

(g)    "Share" means a common share in the capital of the Corporation as constituted at the date hereof;

(h)    "Share Option" means an option to purchase Treasury Shares granted to the Optionee pursuant to this Agreement, and includes any portion of that option; and

(i)    "Treasury Share" means a theretofore unissued Share which is purchased directly from the Corporation by or for the account of the Optionee.

1.2    In this Agreement, the masculine gender shall include the feminine gender and the singular shall include the plural and vice versa wherever the context requires.

## ARTICLE 2
## SHARE OPTION

2.1    Grant of Option:   The Corporation hereby grants to the Optionee, subject to the terms and conditions hereinafter set out, an irrevocable option to purchase at any time or from time to time on or before the Expiration Date, **THREE HUNDRED FIFTY THOUSAND (350,000) SHARES** of the Corporation at a price of **$0.08 (Cdn.)** per Share.

2.2    Expiry:   At 4:30 p.m., Calgary time, on the Expiration Date, the Share Option shall forthwith expire and terminate and be of no further force or effect whatsoever as to such of the Option Shares in respect of which the Share Option hereby granted has not then been exercised.

## ARTICLE 3
## CURRENCY DURING TERM OF SERVICE OR EMPLOYMENT

3.1     Death or Disability:  If subsequent to the Option Date and prior to the Expiration Date, the Optionee's position as a director or consultant of the Corporation or its subsidiary, as the case may be, is terminated by reason of the death or disability of the Optionee, the Share Option may be exercised during the period expiring the earlier of the Expiration Date or one year after such date of death or the date of termination of his tenure due to disability in respect of any balance of Option Shares for which the Share Option has not been exercised, whether or not the relevant period for the exercise of the Option has started.  In the event of the Optionee's death or disability, the rights of the Optionee under the Share Option may be exercised by the person or persons to whom the Optionee's rights under the Share Option shall pass by will or applicable law or, if no such person has such right, by the Optionee's executors or administrators, subject to the time limitations as aforesaid.

3.2     Termination of Position:

(a)     Subject to Clause 3.2(b) hereof, if subsequent to the Option Date and prior to the Expiration Date, the Optionee's position as a director or consultant of the Corporation and/or its subsidiary, as the case may be, is terminated for any reason other than the death or disability of the Optionee, the Share Option may be exercised in respect of any outstanding Option Shares for which the Share Option was capable of exercise prior to the termination (but this shall not include any Option Shares for which the defined period for exercise of the Option has not yet started at the effective date of the termination) during the ninety (90) day period following the date on which the Optionee's position is terminated, and upon the expiry of such ninety (90) day period, the Share Option shall expire.

(b)     If the Optionee's position as a director or consultant of the Corporation and/or its subsidiary is terminated by reason of default on the part of the Optionee, the Optionee's rights under the Share Option shall terminate and shall be of no further force or effect whatsoever as to such of the Option Shares in respect of which the Share Option has not then been exercised.

## ARTICLE 4
## MATERIAL CHANGE

4.1     Change in Share Capital:  In the event that, prior to the Expiration Date or exercise in full of the Share Option:

(a)     the outstanding share capital of the Corporation shall be subdivided or consolidated into a greater or lesser number of Shares;

(b)     a stock dividend shall have been paid by the Corporation; or

(c)     if all the shareholders of the Corporation are granted the right to purchase additional shares of the Corporation;

the number and price of Option Shares remaining subject to the Share Option hereunder shall be increased or reduced accordingly, as the case may be.

4.2    Merger of the Corporation: If, prior to the Expiration Date or the exercise in full of the Share Option granted hereby, the Corporation is dissolved or liquidated or upon a re-organization, merger or consolidation of the Corporation with one or more corporations as a result of which the Corporation is not the surviving corporation, or upon the sale of substantially all of the property or more than eighty (80%) percent of the then outstanding Shares of the Corporation to another corporation, the Plan shall terminate, and any Share Options still outstanding hereunder shall terminate unless provision is made in writing in connection with such transaction for the continuance of the Plan and for the assumption of the Share Options, or the substitution for such Share Options of new options covering the shares of a successor employer corporation, or a parent or subsidiary thereof, with appropriate adjustments as to number and kind of shares and prices, in which event the Plan and Share Options theretofore granted shall continue in the manner and upon the terms so provided. If the Plan and unexercised Share Options shall terminate pursuant to the foregoing sentence the Optionee then entitled to exercise an unexercised portion of Share Options then outstanding shall have the right at such time immediately prior to consummation of the event which results in the termination of the Plan as the Corporation shall designate, to exercise his Share Options to the full extent not theretofore exercised.

## ARTICLE 5
## RESERVATION OF TREASURY SHARES AND REPRICING

5.1    Reservation: The Corporation shall at all times during the term of this Agreement, reserve and keep available a sufficient number of Treasury Shares to satisfy the requirements hereof.

5.2    Repricing: The Corporation may not reduce the exercise price of Option Shares of Optionees who are insiders as that term is defined in the TSX Venture Exchange Corporate Finance Manual without disinterested shareholder approval.

## ARTICLE 6
## RESTRICTION ON ASSIGNMENT

6.1    No Assignment: The Share Option granted hereby is, insofar as the Optionee is concerned, personal, non-transferable and non-assignable and neither this Agreement nor any rights in regard thereto shall be transferable or assignable except upon the death of the Optionee pursuant to Clause 3.1 hereof.

## ARTICLE 7
## EXERCISE OF THE SHARE OPTION

7.1    Exercise: The Share Option may be exercised by the Optionee in accordance with the provisions hereof in whole or in part, from time to time, by delivery of written notice of such exercise and by tendering the payment therefore in cash or by certified cheque to the Corporation at its head office, 111 East Magnesium Road, Suite A, Spokane, Washington, USA 99208. Such notice shall state the number of Option Shares with respect to which the Share Option is then being exercised. The Share Option shall be deemed for all purposes to have been exercised to the extent stated in such notice upon delivery of the notice and a tender of payment in full, notwithstanding any delay in the issuance and delivery of the certificates for the Shares so purchased.

7.2    Hold Periods: Notwithstanding anything herein to the contrary, the Optionee agrees that if it exercises its right to receive Option Shares prior to the Corporation becoming a reporting issuer in the Provinces of Alberta, British Columbia or Ontario, the Option Shares will be subject to a hold period and the share certificates will be issued with a legend reflecting such hold period.

7.3    U.S. Legend:    THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT") OR UNDER ANY STATE SECURITIES LAWS.    THE HOLDER HEREOF, BY PURCHASING SUCH SECURITIES, AGREES FOR THE BENEFIT OF THE COMPANY THAT SUCH SECURITIES MAY BE OFFERED, SOLD OR OTHERWISE TRANSFERRED ONLY (A) TO THE COMPANY, (B) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE U.S. SECURITIES ACT AND APPLICABLE STATE LAWS; (C) OUTSIDE THE UNITED STATES IN ACCORDANCE WITH REGULATION S UNDER THE U.S. SECURITIES ACT. (D) WITHIN THE UNITED STATES IN ACCORDANCE WITH AN EXEMPTION FROM REGISTRATION UNDER THE U.S. SECURITIES ACT PROVIDED BY RULES 144 OR 144A THEREUNDER, IF AVAILABLE, AND IN COMPLIANCE WITH ANY APPLICABLE STATE SECURITIES LAWS, OR (E) IN A TRANSACTION THAT DOES NOT REQUIRE REGISTRATION UNDER THE U.S. SECURITIES ACT OR APPLICABLE STATE SECURITIES LAWS, AND THE SELLER HAS FURNISHED TO THE COMPANY AN OPINION TO SUCH EFFECT, FROM COUNSEL OF RECOGNIZED STANDING REASONABLY SATISFACTORY TO THE COMPANY, PRIOR TO SUCH OFFER, SALE OR TRANSFER. DELIVERY OF THIS CERTIFICATE MAY NOT CONSTITUTE GOOD DELIVERY IN SETTLEMENT OF TRANSACTIONS ON STOCK EXCHANGES IN CANADA.

SUBJECT TO APPLICABLE CANADIAN LAW, AND PROVIDED THAT THE COMPANY IS A "FOREIGN ISSUER" WITHIN THE MEANING OF REGULATION S AT THE TIME OF SALE, AND PROVIDED FURTHER THAT THE FOLLOWING PROCEDURE COMPLIES WITH U.S. SECURITIES LAWS AT THE TIME OF SALE, A NEW CERTIFICATE BEARING NO U.S. RESTRICTIVE LEGENDS MAY BE OBTAINED FROM THE COMPANY'S REGISTRAR AND TRANSFER AGENT UPON DELIVERY OF THIS CERTIFICATE AND A DULY EXECUTED DECLARATION, IN A FORM SATISFACTORY TO THE TRANSFER AGENT AND THE COMPANY, TO THE EFFECT THAT SUCH SALE IS BEING MADE IN ACCORDANCE WITH REGULATION S UNDER THE U.S. SECURITIES ACT.

## ARTICLE 8
## RIGHTS OF THE OPTIONEE PRIOR TO EXERCISE DATE

8.1    No Rights:    The Share Option herein granted shall not entitle the Optionee to any rights whatsoever as a shareholder of the Corporation with respect to any Shares subject to the Share Option until it has been exercised in accordance with Clause 7.1 and Option Shares have been issued as fully paid and non-assessable.

## ARTICLE 9
## MISCELLANEOUS

9.1    Further Assurances:    The parties hereto covenant that they shall and will from time to time and at all times hereafter do and perform all such acts and things and execute all such additional documents as may be required to give effect to the terms and intention of this Agreement.

9.2    Interpretation:    It is understood and agreed by the parties hereto that questions may arise as to the interpretation, construction or enforcement of this Agreement and the parties are desirous of having the Board of the Corporation determine any such question of interpretation, construction or enforcement. It is therefore understood and agreed by and between the parties hereto that any question arising under the terms of this Agreement as to interpretation, construction or enforcement shall be referred to the Board of the Corporation and their majority decision shall be final and binding on both of the parties hereto.

9.3    Entire Agreement:  Subject to the provisions of the Plan, this Agreement supersedes all other agreements, documents, writings and verbal understandings among the parties relating to the subject matter hereof and represents the entire agreement between the parties relating to the subject matter hereof.

9.4    Enurement:  Subject to the other provisions hereof, this Agreement shall enure to the benefit of and be binding upon the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns.

9.5    Change of Control:  This Agreement shall continue to constitute a binding obligation of the Corporation notwithstanding any change of control of its voting securities during the term hereof.

9.6    Governing Law:  This Agreement shall be construed in accordance with the laws of the Province of Alberta and the federal laws of Canada applicable therein.

9.7    Counterpart Execution:  This agreement may be executed in as many counterparts as are necessary and all counterparts together shall constitute one agreement. Facsimile signatures shall and do hereby constitute valid approval of these resolutions.

9.8    Restrictions on Exercise.  This Option may not be exercised until such time as the Plan has been approved by the shareholders of the Corporation.

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement as of the day and year first above written.

| **SIGNED, SEALED AND DELIVERED** | ) |
| **in the presence of:** | ) |
| | ) |
| _____ | ) |
| Witness | ) |

**WILLIAM ROWELL**

**FRANCONIA MINERALS CORPORATION**

Per: _____

Per: _____

**THIS AGREEMENT** made as of the 15th day of April, 2005.

**BETWEEN:**

> **WILLIAM ROWELL,** an individual resident in the City of Lake Forest, in the State of Illinois;
>
> (herein referred to as the "Optionee")
>
> - and -
>
> **FRANCONIA MINERALS CORPORATION,** a body corporate, having an office in the City of Spokane, in the State of Washington
>
> (herein referred to as the "Corporation")

### DIRECTOR AND CONSULTANT STOCK OPTION AGREEMENT (US)

**WHEREAS** the Corporation is incorporated under the laws of the Province of Alberta, having an authorized capital consisting of an unlimited number of common shares without nominal or par value and an unlimited number of Preferred Shares without nominal or par value;

**AND WHEREAS** the Optionee is either a director or a consultant of the Corporation or of a subsidiary corporation of the Corporation;

**AND WHEREAS** the Board has agreed to grant unto the Optionee, pursuant to the terms of the Stock Option Plan dated April 18, 2001, as amended (the "Plan"), an option to purchase an aggregate of **ONE HUNDRED FORTY THOUSAND (140,000) SHARES** without par value of its authorized unissued share capital in consideration of the Optionee's ongoing services and contributions to the Corporation or to any of its subsidiaries or affiliates; and

**AND WHEREAS** the granting of such option to the Optionee was authorized by the Board effective April 15, 2005.

**NOW, THEREFORE THIS AGREEMENT WITNESSES** that in consideration of the premises and mutual covenants hereinafter set forth, and for other valuable consideration, the parties hereto have agreed as follows:

## ARTICLE 1
## DEFINITIONS

1.1    Definitions:

In this Agreement the following terms shall have the following meanings:

(a)    "Agreement", "herein", "hereto", "hereof" and similar expressions means this Agreement, and includes any Agreement amending this Agreement or any Agreement or instrument which is supplemental or ancillary hereof;

(b)    "Board" means the Board of Directors of the Corporation;

(c)    "Corporation" means Franconia Minerals Corporation and any successor or continuing corporation resulting from any form of corporate reorganization;

(d)    "Expiration Date" means April 15, 2010;

(e)    "Option Date" in respect of Share Option means the date of this Agreement;

(f)    "Option Shares" means the Shares the Optionee is entitled to purchase under a Share Option;

(g)    "Share" means a common share in the capital of the Corporation as constituted at the date hereof;

(h)    "Share Option" means an option to purchase Treasury Shares granted to the Optionee pursuant to this Agreement, and includes any portion of that option; and

(i)    "Treasury Share" means a theretofore unissued Share which is purchased directly from the Corporation by or for the account of the Optionee.

1.2    In this Agreement, the masculine gender shall include the feminine gender and the singular shall include the plural and vice versa wherever the context requires.

## ARTICLE 2
## SHARE OPTION

2.1    Grant of Option:  The Corporation hereby grants to the Optionee, subject to the terms and conditions hereinafter set out, an irrevocable option to purchase at any time or from time to time on or before the Expiration Date, **ONE HUNDRED FORTY THOUSAND (140,000) SHARES** of the Corporation at a price of **$0.42 (Cdn.)** per Share.

2 .2    Expiry:  At 4:30 p.m., Calgary time, on the Expiration Date, the Share Option shall forthwith expire and terminate and be of no further force or effect whatsoever as to such of the Option Shares in respect of which the Share Option hereby granted has not then been exercised.

## ARTICLE 3
## CURRENCY DURING TERM OF SERVICE OR EMPLOYMENT

3.1    <u>Death or Disability</u>:  If subsequent to the Option Date and prior to the Expiration Date, the Optionee's position as a director or consultant of the Corporation or its subsidiary, as the case may be, is terminated by reason of the death or disability of the Optionee, the Share Option may be exercised during the period expiring the earlier of the Expiration Date or one year after such date of death or the date of termination of his tenure due to disability in respect of any balance of Option Shares for which the Share Option has not been exercised, whether or not the relevant period for the exercise of the Option has started.  In the event of the Optionee's death or disability, the rights of the Optionee under the Share Option may be exercised by the person or persons to whom the Optionee's rights under the Share Option shall pass by will or applicable law or, if no such person has such right, by the Optionee's executors or administrators, subject to the time limitations as aforesaid.

3.2    <u>Termination of Position</u>:

(a)    Subject to Clause 3.2(b) hereof, if subsequent to the Option Date and prior to the Expiration Date, the Optionee's position as a director or consultant of the Corporation and/or its subsidiary, as the case may be, is terminated for any reason other than the death or disability of the Optionee, the Share Option may be exercised in respect of any outstanding Option Shares for which the Share Option was capable of exercise prior to the termination (but this shall not include any Option Shares for which the defined period for exercise of the Option has not yet started at the effective date of the termination) during the ninety (90) day period following the date on which the Optionee's position is terminated, and upon the expiry of such ninety (90) day period, the Share Option shall expire.

(b)    If the Optionee's position as a director or consultant of the Corporation and/or its subsidiary is terminated by reason of default on the part of the Optionee, the Optionee's rights under the Share Option shall terminate and shall be of no further force or effect whatsoever as to such of the Option Shares in respect of which the Share Option has not then been exercised.

## ARTICLE 4
## MATERIAL CHANGE

4.1    <u>Change in Share Capital</u>:  In the event that, prior to the Expiration Date or exercise in full of the Share Option:

(a)    the outstanding share capital of the Corporation shall be subdivided or consolidated into a greater or lesser number of Shares;

(b)    a stock dividend shall have been paid by the Corporation; or

(c)    if all the shareholders of the Corporation are granted the right to purchase additional shares of the Corporation;

the number and price of Option Shares remaining subject to the Share Option hereunder shall be increased or reduced accordingly, as the case may be.

4.2    Merger of the Corporation:  If, prior to the Expiration Date or the exercise in full of the Share Option granted hereby, the Corporation is dissolved or liquidated or upon a re-organization, merger or consolidation of the Corporation with one or more corporations as a result of which the Corporation is not the surviving corporation, or upon the sale of substantially all of the property or more than eighty (80%) percent of the then outstanding Shares of the Corporation to another corporation, the Plan shall terminate, and any Share Options still outstanding hereunder shall terminate unless provision is made in writing in connection with such transaction for the continuance of the Plan and for the assumption of the Share Options, or the substitution for such Share Options of new options covering the shares of a successor employer corporation, or a parent or subsidiary thereof, with appropriate adjustments as to number and kind of shares and prices, in which event the Plan and Share Options theretofore granted shall continue in the manner and upon the terms so provided.  If the Plan and unexercised Share Options shall terminate pursuant to the foregoing sentence the Optionee then entitled to exercise an unexercised portion of Share Options then outstanding shall have the right at such time immediately prior to consummation of the event which results in the termination of the Plan as the Corporation shall designate, to exercise his Share Options to the full extent not theretofore exercised.

## ARTICLE 5
## RESERVATION OF TREASURY SHARES AND REPRICING

5.1    Reservation:  The Corporation shall at all times during the term of this Agreement, reserve and keep available a sufficient number of Treasury Shares to satisfy the requirements hereof.

5.2    Repricing:  The Corporation may not reduce the exercise price of Option Shares of Optionees who are insiders as that term is defined in the TSX Venture Exchange Corporate Finance Manual without disinterested shareholder approval.

## ARTICLE 6
## RESTRICTION ON ASSIGNMENT

6.1    No Assignment:  The Share Option granted hereby is, insofar as the Optionee is concerned, personal, non-transferable and non-assignable and neither this Agreement nor any rights in regard thereto shall be transferable or assignable except upon the death of the Optionee pursuant to Clause 3.1 hereof.

## ARTICLE 7
## EXERCISE OF THE SHARE OPTION

7.1    Exercise:  The Share Option may be exercised by the Optionee in accordance with the provisions hereof in whole or in part, from time to time, by delivery of written notice of such exercise and by tendering the payment therefore in cash or by certified cheque to the Corporation at its head office, 111 East Magnesium Road, Suite A, Spokane, Washington, USA 99208.  Such notice shall state the number of Option Shares with respect to which the Share Option is then being exercised.  The Share Option shall be deemed for all purposes to have been exercised to the extent stated in such notice upon delivery of the notice and a tender of payment in full, notwithstanding any delay in the issuance and delivery of the certificates for the Shares so purchased.

7.2    U.S. Legend:    THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT") OR UNDER ANY STATE SECURITIES LAWS.  THE HOLDER HEREOF, BY PURCHASING SUCH SECURITIES, AGREES FOR THE BENEFIT OF THE COMPANY THAT SUCH SECURITIES MAY BE OFFERED, SOLD OR OTHERWISE

TRANSFERRED ONLY (A) TO THE COMPANY, (B) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE U.S. SECURITIES ACT AND APPLICABLE STATE LAWS; (C) OUTSIDE THE UNITED STATES IN ACCORDANCE WITH REGULATION S UNDER THE U.S. SECURITIES ACT, (D) WITHIN THE UNITED STATES IN ACCORDANCE WITH AN EXEMPTION FROM REGISTRATION UNDER THE U.S. SECURITIES ACT PROVIDED BY RULES 144 OR 144A THEREUNDER, IF AVAILABLE, AND IN COMPLIANCE WITH ANY APPLICABLE STATE SECURITIES LAWS, OR (E) IN A TRANSACTION THAT DOES NOT REQUIRE REGISTRATION UNDER THE U.S. SECURITIES ACT OR APPLICABLE STATE SECURITIES LAWS, AND THE SELLER HAS FURNISHED TO THE COMPANY AN OPINION TO SUCH EFFECT, FROM COUNSEL OF RECOGNIZED STANDING REASONABLY SATISFACTORY TO THE COMPANY, PRIOR TO SUCH OFFER, SALE OR TRANSFER. DELIVERY OF THIS CERTIFICATE MAY NOT CONSTITUTE GOOD DELIVERY IN SETTLEMENT OF TRANSACTIONS ON STOCK EXCHANGES IN CANADA.

SUBJECT TO APPLICABLE CANADIAN LAW, AND PROVIDED THAT THE COMPANY IS A "FOREIGN ISSUER" WITHIN THE MEANING OF REGULATION S AT THE TIME OF SALE, AND PROVIDED FURTHER THAT THE FOLLOWING PROCEDURE COMPLIES WITH U.S. SECURITIES LAWS AT THE TIME OF SALE, A NEW CERTIFICATE BEARING NO U.S. RESTRICTIVE LEGENDS MAY BE OBTAINED FROM THE COMPANY'S REGISTRAR AND TRANSFER AGENT UPON DELIVERY OF THIS CERTIFICATE AND A DULY EXECUTED DECLARATION, IN A FORM SATISFACTORY TO THE TRANSFER AGENT AND THE COMPANY, TO THE EFFECT THAT SUCH SALE IS BEING MADE IN ACCORDANCE WITH REGULATION S UNDER THE U.S. SECURITIES ACT.

## ARTICLE 8
## RIGHTS OF THE OPTIONEE PRIOR TO EXERCISE DATE

8.1     No Rights:  The Share Option herein granted shall not entitle the Optionee to any rights whatsoever as a shareholder of the Corporation with respect to any Shares subject to the Share Option until it has been exercised in accordance with Clause 7.1 and Option Shares have been issued as fully paid and non-assessable.

## ARTICLE 9
## MISCELLANEOUS

9.1     Further Assurances:  The parties hereto covenant that they shall and will from time to time and at all times hereafter do and perform all such acts and things and execute all such additional documents as may be required to give effect to the terms and intention of this Agreement.

9.2     Interpretation:  It is understood and agreed by the parties hereto that questions may arise as to the interpretation, construction or enforcement of this Agreement and the parties are desirous of having the Board of the Corporation determine any such question of interpretation, construction or enforcement. It is therefore understood and agreed by and between the parties hereto that any question arising under the terms of this Agreement as to interpretation, construction or enforcement shall be referred to the Board of the Corporation and their majority decision shall be final and binding on both of the parties hereto.

9.3     Entire Agreement:  Subject to the provisions of the Plan, this Agreement supersedes all other agreements, documents, writings and verbal understandings among the parties relating to the subject matter hereof and represents the entire agreement between the parties relating to the subject matter hereof.



**THIS AGREEMENT** made as of the 23rd day of November, 2006.


**BETWEEN:**

>           **WILLIAM ROWELL**, an individual resident in the
>           City of Lake Forest, in the State of Illinois;
>
>           (herein referred to as the "Optionee")


>                        - and -


>           **FRANCONIA MINERALS CORPORATION**, a body
>           corporate, having an office in the City of Spokane, in the
>           State of Washington
>
>           (herein referred to as the "Corporation")


### DIRECTOR AND CONSULTANT STOCK OPTION AGREEMENT (US)


**WHEREAS** the Corporation is incorporated under the laws of the Province of Alberta, having an authorized capital consisting of an unlimited number of common shares without nominal or par value and an unlimited number of Preferred Shares without nominal or par value;

**AND WHEREAS** the Optionee is either a director or a consultant of the Corporation or of a subsidiary corporation of the Corporation;

**AND WHEREAS** the Board has agreed to grant unto the Optionee, pursuant to the terms of the Stock Option Plan dated April 18, 2001, as amended (the "Plan"), an option to purchase an aggregate of **SIXTY-FIVE THOUSAND (65,000) SHARES** without par value of its authorized unissued share capital in consideration of the Optionee's ongoing services and contributions to the Corporation or to any of its subsidiaries or affiliates; and

**AND WHEREAS** the granting of such option to the Optionee was authorized by the Board effective November 23, 2006.

**NOW, THEREFORE THIS AGREEMENT WITNESSES** that in consideration of the premises and mutual covenants hereinafter set forth, and for other valuable consideration, the parties hereto have agreed as follows:

## ARTICLE 1
## DEFINITIONS

1.1    Definitions:

In this Agreement the following terms shall have the following meanings:

(a)    "Agreement", "herein", "hereto", "hereof" and similar expressions means this Agreement, and includes any Agreement amending this Agreement or any Agreement or instrument which is supplemental or ancillary hereof;

(b)    "Board" means the Board of Directors of the Corporation;

(c)    "Corporation" means Franconia Minerals Corporation and any successor or continuing corporation resulting from any form of corporate reorganization;

(d)    "Expiration Date" means November 23, 2011;

(e)    "Option Date" in respect of Share Option means the date of this Agreement;

(f)    "Option Shares" means the Shares the Optionee is entitled to purchase under a Share Option;

(g)    "Share" means a common share in the capital of the Corporation as constituted at the date hereof;

(h)    "Share Option" means an option to purchase Treasury Shares granted to the Optionee pursuant to this Agreement, and includes any portion of that option; and

(i)    "Treasury Share" means a theretofore unissued Share which is purchased directly from the Corporation by or for the account of the Optionee.

1.2    In this Agreement, the masculine gender shall include the feminine gender and the singular shall include the plural and vice versa wherever the context requires.

## ARTICLE 2
## SHARE OPTION

2.1    Grant of Option:  The Corporation hereby grants to the Optionee, subject to the terms and conditions hereinafter set out, an irrevocable option to purchase at any time or from time to time on or before the Expiration Date, **SIXTY-FIVE THOUSAND (65,000) SHARES** of the Corporation at a price of **$1.45 (Cdn.)** per Share.

2 .2    Expiry:  At 4:30 p.m., Calgary time, on the Expiration Date, the Share Option shall forthwith expire and terminate and be of no further force or effect whatsoever as to such of the Option Shares in respect of which the Share Option hereby granted has not then been exercised.

## ARTICLE 3
## CURRENCY DURING TERM OF SERVICE OR EMPLOYMENT

3.1    Death or Disability:  If subsequent to the Option Date and prior to the Expiration Date, the Optionee's position as a director or consultant of the Corporation or its subsidiary, as the case may be, is terminated by reason of the death or disability of the Optionee, the Share Option may be exercised during the period expiring the earlier of the Expiration Date or one year after such date of death or the date of termination of his tenure due to disability in respect of any balance of Option Shares for which the Share Option has not been exercised, whether or not the relevant period for the exercise of the Option has started.  In the event of the Optionee's death or disability, the rights of the Optionee under the Share Option may be exercised by the person or persons to whom the Optionee's rights under the Share Option shall pass by will or applicable law or, if no such person has such right, by the Optionee's executors or administrators, subject to the time limitations as aforesaid.

3.2    Termination of Position:

(a)    Subject to Clause 3.2(b) hereof, if subsequent to the Option Date and prior to the Expiration Date, the Optionee's position as a director or consultant of the Corporation and/or its subsidiary, as the case may be, is terminated for any reason other than the death or disability of the Optionee, the Share Option may be exercised in respect of any outstanding Option Shares for which the Share Option was capable of exercise prior to the termination (but this shall not include any Option Shares for which the defined period for exercise of the Option has not yet started at the effective date of the termination) during the ninety (90) day period following the date on which the Optionee's position is terminated, and upon the expiry of such ninety (90) day period, the Share Option shall expire.

(b)    If the Optionee's position as a director or consultant of the Corporation and/or its subsidiary is terminated by reason of default on the part of the Optionee, the Optionee's rights under the Share Option shall terminate and shall be of no further force or effect whatsoever as to such of the Option Shares in respect of which the Share Option has not then been exercised.

## ARTICLE 4
## MATERIAL CHANGE

4.1    Change in Share Capital:  In the event that, prior to the Expiration Date or exercise in full of the Share Option:

(a)    the outstanding share capital of the Corporation shall be subdivided or consolidated into a greater or lesser number of Shares;

(b)    a stock dividend shall have been paid by the Corporation; or

(c)    if all the shareholders of the Corporation are granted the right to purchase additional shares of the Corporation;

the number and price of Option Shares remaining subject to the Share Option hereunder shall be increased or reduced accordingly, as the case may be.

4.2    Merger of the Corporation: If, prior to the Expiration Date or the exercise in full of the Share Option granted hereby, the Corporation is dissolved or liquidated or upon a re-organization, merger or consolidation of the Corporation with one or more corporations as a result of which the Corporation is not the surviving corporation, or upon the sale of substantially all of the property or more than eighty (80%) percent of the then outstanding Shares of the Corporation to another corporation, the Plan shall terminate, and any Share Options still outstanding hereunder shall terminate unless provision is made in writing in connection with such transaction for the continuance of the Plan and for the assumption of the Share Options, or the substitution for such Share Options of new options covering the shares of a successor employer corporation, or a parent or subsidiary thereof, with appropriate adjustments as to number and kind of shares and prices, in which event the Plan and Share Options theretofore granted shall continue in the manner and upon the terms so provided. If the Plan and unexercised Share Options shall terminate pursuant to the foregoing sentence the Optionee then entitled to exercise an unexercised portion of Share Options then outstanding shall have the right at such time immediately prior to consummation of the event which results in the termination of the Plan as the Corporation shall designate, to exercise his Share Options to the full extent not theretofore exercised.

## ARTICLE 5
## RESERVATION OF TREASURY SHARES AND REPRICING

5.1    Reservation: The Corporation shall at all times during the term of this Agreement, reserve and keep available a sufficient number of Treasury Shares to satisfy the requirements hereof.

5.2    Repricing: The Corporation may not reduce the exercise price of Option Shares of Optionees who are insiders as that term is defined in the TSX Venture Exchange Corporate Finance Manual without disinterested shareholder approval.

## ARTICLE 6
## RESTRICTION ON ASSIGNMENT

6.1    No Assignment: The Share Option granted hereby is, insofar as the Optionee is concerned, personal, non-transferable and non-assignable and neither this Agreement nor any rights in regard thereto shall be transferable or assignable except upon the death of the Optionee pursuant to Clause 3.1 hereof.

## ARTICLE 7
## EXERCISE OF THE SHARE OPTION

7.1    Exercise: The Share Option may be exercised by the Optionee in accordance with the provisions hereof in whole or in part, from time to time, by delivery of written notice of such exercise and by tendering the payment therefore in cash or by certified cheque to the Corporation at its head office, 111 East Magnesium Road, Suite A, Spokane, Washington, USA 99208. Such notice shall state the number of Option Shares with respect to which the Share Option is then being exercised. The Share Option shall be deemed for all purposes to have been exercised to the extent stated in such notice upon delivery of the notice and a tender of payment in full, notwithstanding any delay in the issuance and delivery of the certificates for the Shares so purchased.

7.2    Hold Periods: Notwithstanding anything herein to the contrary, the Optionee agrees that if it exercises its right to receive Option Shares prior to March 24, 2007, the Option Shares will be subject to a hold period and the share certificates will be issued with a legend reflecting such hold period.

7.3    U.S. Legend:    THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE

9.3    Entire Agreement:  Subject to the provisions of the Plan, this Agreement supersedes all other agreements, documents, writings and verbal understandings among the parties relating to the subject matter hereof and represents the entire agreement between the parties relating to the subject matter hereof.

9.4    Enurement:  Subject to the other provisions hereof, this Agreement shall enure to the benefit of and be binding upon the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns.

9.5    Change of Control:  This Agreement shall continue to constitute a binding obligation of the Corporation notwithstanding any change of control of its voting securities during the term hereof.

9.6    Governing Law:  This Agreement shall be construed in accordance with the laws of the Province of Alberta and the federal laws of Canada applicable therein.

9.7    Counterpart Execution:  This agreement may be executed in as many counterparts as are necessary and all counterparts together shall constitute one agreement. Facsimile signatures shall and do hereby constitute valid approval of these resolutions.

9.8    Restrictions on Exercise.  This Option may not be exercised until such time as the Plan has been approved by the shareholders of the Corporation.

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement as of the day and year first above written.

**SIGNED, SEALED AND DELIVERED**          )
**in the presence of:**                                   )
                                                                       )
_____          )        _____
· Witness ·                                                    )        WILLIAM ROWELL

                                                                            FRANCONIA MINERALS CORPORATION

                                                                            Per: _____

                                                                            Per: _____



EXHIBIT
6

**SCHEDULE B**

**FRANCONIA MINERALS CORPORATION**

**AMENDED  STOCK OPTION PLAN**

~~June 6, 2005~~August 17, 2007 and March 19, 2008

1.    **Purpose**

The purpose of the Stock Option Plan (the "Plan") of Franconia Minerals Corporation, a corporation incorporated under the *Business Corporations Act* (Alberta) (the "Corporation"), is to advance the interests of the Corporation or any of its subsidiaries or affiliates by encouraging the directors, officers, employees and consultants of the Corporation or any of its subsidiaries or affiliates to acquire common shares in the Corporation, thereby increasing their proprietary interest in the Corporation, encouraging them to remain associated with the Corporation or any of its subsidiaries or affiliates and furnishing them with additional incentive in their efforts on behalf of the Corporation or any of its subsidiaries or affiliates in the conduct of their affairs.

2.    **Administration and Granting of Options**

The Plan shall be administered by the board of directors of the Corporation (the "Board") or a committee established by the board of directors for that purpose (the "Committee").  A majority of the Board or the Committee, as applicable shall constitute a quorum, and the acts of a majority of the Board or members of the Committee, as applicable, present at any meeting at which a quorum is present, or acts unanimously approved in writing, shall be the acts of the ~~directors~~Board or the Committee, as applicable.

Subject to the provisions of the Plan, the Board or the Committee, as applicable, shall have authority to construe and interpret the Plan and all option agreements entered into thereunder, to define the terms used in the Plan and in all option agreements entered into thereunder, to prescribe, amend and rescind rules and regulations relating to the Plan and to make all other determinations necessary or advisable for the administration of the Plan.  All determinations and interpretations made by the Board or the Committee, as applicable, shall be binding and conclusive on all participants in the Plan and on their legal personal representatives and beneficiaries.

Each option granted hereunder shall be evidenced by an agreement, signed on behalf of the Corporation and by the optionee, in such form as the ~~directors~~Board, or the Committee, as applicable, shall approve.  Each such agreement shall recite that it is subject to the provisions of this Plan.

3.    **Shares Subject to Plan**

Subject to adjustment as provided in Section 16 hereof, the shares to be offered under the Plan shall consist of shares of the Corporation's authorized but unissued common shares.  The aggregate number of shares to be delivered upon the exercise of all options granted under the Plan shall not exceed ~~20~~10% of the Corporation's issued and outstanding common shares from time to time, to a maximum of ~~4,412,320~~5,762,977 shares. If any option granted hereunder shall be cancelled, expire or terminate for any

reason without having been exercised in full, the unpurchased shares subject thereto shall again be available for the purpose of this Plan.

4.    **Number of Optioned Shares**

The number of shares subject to an option to a Participant, as hereinafter defined, shall be determined by the Board, or the Committee, as applicable, but no Participant, as hereinafter defined, upon the Corporation becoming listed on any stock exchange, shall be granted an option which exceeds the maximum number of shares permitted by any stock exchange on which the common shares are then listed or other regulatory body having jurisdiction.

The maximum number of shares which may be reserved for issuance to insiders pursuant to the exercise of options granted (the term "insider" shall have the meaning ascribed thereto in the *Securities Act* (Alberta) and the Toronto Stock Exchange Policies from time to time) under the Plan, together with any other security based compensation arrangements of the Corporation, shall not exceed 10% of the shares issued and outstanding at the time of the grant (on a non-diluted basis). The maximum number of shares which may be issued to insiders upon exercise of options granted under the Plan, together with any other security based compensation arrangements of the Corporation, within any one year period shall not exceed 10% of the issued and outstanding shares.

5.    **Vesting**

The Board or the Committee, as applicable may, in its sole discretion, determine the time during which options shall vest and the method of vesting, or that no vesting restriction shall exist.

6.    **Maintenance of Sufficient Capital**

The Corporation shall at all times during the term of the Plan reserve and keep available such numbers of shares as will be sufficient to satisfy the requirements of the Plan.

7.    **Participation**

Directors, officers, management, consultants and employees of the Corporation, and of its subsidiary and affiliated companies and employees of a person or company which provides management services to the Corporation or its subsidiaries or affiliates ("Management Company Employees"), shall be eligible for selection to participate in the Plan (such persons hereinafter collectively referred to as "Participants"). Participants may elect to hold options granted to them in a personal holding company of the Participant, the shares of which are held by the Participant, the Participant's spouse, minor children and/or minor grandchildren and such entity shall be bound by the Plan in the same manner as if the options were held directly by the Participant. Subject to the terms hereof, the Board or the Committee, as applicable shall determine to whom options shall be granted, the terms and provisions of the respective option agreements, the time or times at which such options shall be granted, and the number of shares to be subject to each option. In the case of employees and consultants or Management Company Employees, the option agreements to which they are party must contain a representation of the Corporation that the employee, consultant or Management Company Employee, as the case may be, is a

2

bona fide employee, consultant or Management Company Employee of the Corporation or its subsidiary. An individual who has been granted an option may, if he is otherwise eligible, and if permitted under the policies of the stock exchange or stock exchanges on which the shares of the Corporation are to be listed, be granted an additional option or options if the ~~directors~~ Board or the Committee, as applicable shall so determine.

8.    **Exercise Price**

The exercise price of the shares covered by each option shall be determined by the ~~directors~~Board, or the Committee, as applicable, however, if the Corporation's shares are listed on a stock exchange ~~or quoted~~, the exercise price shall be not less than the closing price of the Corporation's shares on the stock exchange ~~or stock exchanges~~ on which the shares of the Corporation are listed on the last trading day immediately preceding the day on which the ~~stock exchange is notified of the proposed issuance of option, less any discounts permitted by the policy or policies of such stock exchange or stock exchanges~~ options are granted, subject to applicable laws and regulations. ~~The exercise price shall not be less than the price permitted by any stock exchange on which the common shares are then listed or other regulatory body having jurisdiction.~~ If the shares of the Corporation have not traded on any exchange or over-the-counter market for an extended period of time, the exercise price of the options will be the fair market value of the shares as determined by the Board or the Committee, as applicable.

9.    **Duration of Option**

Each option and all rights thereunder shall be expressed to expire on the date set out in the option agreements and shall be subject to earlier termination as provided in paragraphs 11 and 12.

10.    **Option Period, Consideration and Payment**

(a)    The option period shall be a period of time fixed by the Board, or the Committee, as applicable, not to exceed the maximum period permitted by any stock exchange on which the common shares are then listed or other regulatory body having jurisdiction, provided that the option period shall be reduced with respect to any option as provided in Sections 11 and 12 covering cessation as a director, officer, employee, consultant or Management Company Employee of the Corporation or any of its subsidiaries or affiliated companies or death of the Participant. Notwithstanding the foregoing, the expiry date of the option ("Fixed Term") will be adjusted, without being subject to discretion of the Board or the Committee, as applicable, to take into account any self-imposed blackout period by the Corporation imposed on the Participant as follows: a) if the Fixed Term of the option falls within a blackout period imposed on the Participant by the Corporation, then the Fixed Term of the option is the close of the 10th business day after the end of the such blackout period (the "Blackout Expiration Term"); or b) if the Fixed Term falls within two business days after the end of a blackout period imposed on the Participant by the Corporation, then the Fixed Term will be that date which is the Blackout Expiration Term reduced by the number of business days between the Fixed Term and the end of such blackout period (ie options whose Fixed Term expires two business days after the end of the blackout period will only have an additional eight business days to exercise).

3

(b)Except as set forth in Sections ~~10(e),~~ 11 and 12, no option may be exercised unless the Participant is at the time of such exercise a director, officer, employee, consultant or Management Company Employee of the Corporation or any of its subsidiaries or affiliates.

~~(e)(b)    Notwithstanding any other provision to the contrary, an option granted to a consultant in connection with specific services provided or to be provided by that consultant shall be exercised only after the date of completion of such service and prior to 30 days following the date of completion of such service.~~

(d)(c)    The exercise of any option will be contingent upon receipt by the Corporation at its head office of a written notice of exercise, specifying the number of shares with respect to which the option is being exercised, accompanied by cash payment, certified cheque, funds wired to the Corporation's bank account or a bank draft for the full purchase price of such shares with respect to which the option is exercised.  No Participant or his legal representatives, legatees or distributees will be, or will be deemed to be, a holder of any shares subject to an option under this Plan, unless and until the certificates for such shares are issued to such persons under the terms of the Plan.

11.    **Ceasing To Be a Director, Officer, Employee or Consultant**

If a Participant shall cease to be a director, officer, employee, or consultant of the Corporation or of its subsidiary or affiliated company or a Management Company Employee, for any reason (other than death), he may exercise his option to the extent that he was entitled to exercise it at the date of such cessation, but may only do so within the period of time after such cessation being:

(a)    the lesser of the time stipulated in the agreement evidencing the option and a maximum of three years, for full time employees; or

(b)    the lesser of the time stipulated in the agreement evidencing the option and a maximum of one year, for other service providers including directors.

Nothing contained in the Plan, nor in any option granted pursuant to the Plan, shall as such confer upon any Participant any right with respect to continuance as a director, officer, manager, employee or consultant of the Corporation or of any affiliate.

12.    **Death of Participant**

In the event of the death of a Participant, the option previously granted to him shall be exercisable only within the period of time being:

(a)    the lesser of the time stipulated in the agreement evidencing the option and a maximum of three years, for full time employees; or

(b)    the lesser of the time stipulated in the agreement evidencing the option and a maximum of one year, for other service providers including directors;

4

and then only:

    (c)     by the person or persons to whom the Participant's rights under the option shall pass by the Participant's will or the laws of descent and distribution; and

    (d)     if and to the extent that he was entitled to exercise the option at the date of his death.

13.    **Certain Limitations Regarding Incentive Stock Options Granted to U.S. Residents**

    Any of the options issuable under the Plan, up to the maximum number of options that may be issued under section 3 of the Plan, may be issued as Incentive Stock Options ("ISOs") as defined in Section 422 of the U.S. Internal Revenue Code of 1986, as amended (the "Code") may be granted only to an individual who is an employee of the Corporation and shall be subject to the following limitations:

    (a)     <u>Exercise Price</u>.  Determination of the option price per share for any stock option issued hereunder shall rest in the discretion of the Board or the Committee, as applicable, provided that the exercise price for any ISO shall not be less than the fair market value per share of the Corporation's shares at the time the option is granted and subject further to subparagraph (f) this Section 13.  For the purposes of this Plan, the fair market value of Corporation's shares ("Shares"), as of any date, shall be determined as follows:

    (i)     If the Shares are listed on any established stock exchange or a national market system, its fair market value shall be the closing sales price for such Shares (or the closing bid, if no sales were reported), as quoted on such system or exchange, or the system or exchange with the greatest volume of trading in Shares, for the last market trading day prior to the time of determination;

    (ii)     If the Shares are regularly quoted by a recognized securities dealer but selling prices are not reported, its fair market value shall be the mean between the high bid and low asked prices for the Shares for the last market trading day prior to the time of determination; or

    (iii)     In the absence of an established market for the Shares, the fair market value thereof shall be determined in good faith by the Board.

    (b)     Subject to the restrictions imposed on ISOs as contained in Section 13, the term of each option shall be established by the Board and, if not so established, shall be ten years from the date such ISO is granted.  The Board, in its discretion, may provide that an option shall be exercisable during such ten-year period or during any lesser period of time.

    (c)     <u>Nontransferability of ISOs</u>.  No right or interest in any ISO granted under this Plan shall be assignable or transferable except upon the death of the option holder ("Optionee") pursuant to the terms of such Optionee's will or the laws of descent and distribution.

    (d)     <u>Termination of Employment, Disability and Death</u>.

    (1)     <u>Termination</u>. If the Optionee's relationship with the Corporation, its subsidiaries or affiliates shall terminate for any reason other than death or disability, the ISO may be exercised by the

5

Optionee at any time prior to the expiration of three (3) months after the date of such termination of employment (unless by its terms the option sooner terminates or expires), but only if and to the extent the Optionee was entitled to exercise the option at the date of such termination.

   (2) <u>Disability</u>. If the Optionee's relationship with the Corporation, its subsidiaries or affiliates ceases as a result of the Optionee's disability (as herein defined), the ISO shall not terminate for a period of one (1) year after the date of such termination (unless by its terms the option sooner terminates or expires), but only if and to the extent the Optionee was entitled to exercise the option at the date of such cessation. For purposes of this paragraph, an Optionee will be considered to be disabled if the Optionee is unable to engage in any substantial gainful activity by reason of any medically determinable mental or physical impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

   (3) <u>Death</u>. If the Optionee's relationship with the Corporation, its subsidiaries or affiliates, ceases as a result of the death of the Optionee, the option shall be exercisable on or prior to the expiration of one (1) year after the date of such death (unless by its terms the option sooner terminates and expires), but only if and to the extent the Optionee was entitled to exercise the option at the date of such death and only by the Optionee's personal representative if then subject to administration as part of the Optionee's estate, or by the person or persons to whom such Optionee's rights under the option shall have passed by the Optionee's will or by the applicable laws of descent and distribution.

  (e) <u>Limitation on Amount of Grants</u>. To the extent that an Optionee is granted ISOs that in the aggregate (together with all other ISOs granted by the Corporation or its subsidiaries) entitle the Optionee to purchase, in any calendar year during which such options first become exercisable, stock of the Corporation, any subsidiary having a fair market value (determined as of the time of such options are granted) in excess of $100,000, such options in excess of the $100,000 threshold shall not be treated as ISOs, but shall be considered to be nonqualified stock options ("NSOs"). No limitation shall apply to NSOs.

  (f) <u>Grants to Ten Percent Shareholders</u>. Subject to the terms of this Plan, if ISOs may be granted to a person who, at the time the option is granted, owns more than ten percent (10%) of the total combined voting power of all classes of stock of the Corporation and any subsidiary only if: (i) the exercise price is at least 110 percent of the fair market value of the Shares at the time of grant, and (ii) the option is not exercisable more than five (5) years from the date of grant.

  (g) <u>Shareholder Approval of Plan</u>. Subject to the requirements of Code Section 422 with respect to ISOs, the terms, conditions and limitations of the Plan must be approved by the Corporation's shareholders within 12 months before or after the adoption of the Plan or any amendment or modification thereto. Any such amendment or modification of the Plan, however, shall not alter, impair or diminish the rights of any option previously granted under the Plan without the written consent of the option holder. Nor shall the Board modify or amend any outstanding ISO so as to specify a lower exercise price for the ISO.

  (h) <u>Notice of Disposition</u> Any option which is issued as an ISO under this Plan, shall, notwithstanding any other provisions of this Plan or the option terms to the contrary, contain all of the terms, conditions, restrictions, rights and limitations required to be an Incentive Stock Option, and any provision to the contrary shall be disregarded. In order to obtain certain tax benefits afforded to incentive

6

stock options under Section 422 of the Code, the Optionee must hold the Shares issued upon the exercise of an ISO for a minimum of two (2) years after the date of grant of the ISO and one (1) year from the date of exercise. The Board may require an Optionee to give the Corporation prompt notice of any subsequent disposition of shares acquired on exercise of such ISO prior to the expiration of the above holding periods.

14.    **Rights of ~~Optionee~~Participant**

No person entitled to exercise an option shall have any of the rights or privileges of a shareholder of the Corporation in respect of any shares issuable upon exercise of such option until certificates representing such shares shall have been issued and delivered.

15.    **Proceeds from ~~Sale of Shares~~Exercise of Options**

The proceeds from ~~sale of shares issued upon~~ the exercise of options shall be added to the general funds of the Corporation and shall thereafter be used from time to time for such corporate purposes as the Board may determine and direct.

16.    **Adjustments**

If the outstanding shares of the Corporation are increased, decreased, changed into or exchanged for a different number or kind of shares of securities of the Corporation through re-organization, merger, re-capitalization, re-classification, stock dividend, subdivision or consolidation, an appropriate and proportionate adjustment shall be made in the maximum number or kind of shares as to which options may be granted under the Plan. A corresponding adjustment changing the number or kind of shares allocated to unexercised options or portions thereof, which shall have been granted prior to any such change, shall likewise be made. Any such adjustment in the outstanding options shall be made without change in the aggregate purchase price applicable to the unexercised portion of the option but with a corresponding adjustment in the price for each share or other unit of any security covered by the option.

Upon the liquidation or dissolution of the Corporation or upon a re-organization, merger or consolidation of the Corporation with one or more corporations as a result of which the Corporation is not the surviving corporation, or upon the sale of substantially all of the property or more than ~~eighty~~ forty percent (~~80~~40%) ~~percent~~ of the then outstanding shares of the Corporation to another corporation (the "Triggering Event"), the Plan shall terminate, and any options theretofore granted hereunder shall terminate unless provision is made in writing in connection with such transaction for the continuance of the Plan and for the assumption of options theretofore granted, or the substitution for such options of new options covering the shares of a successor employer corporation, or a parent or subsidiary thereof, with appropriate adjustments as to number and kind of shares and prices, in which event the Plan and options theretofore granted shall continue in the manner and upon the terms so provided. If the Plan and unexercised options shall terminate pursuant to ~~the foregoing sentence all persons then entitled to exercise an unexercised portion of options then outstanding shall have the right at such time immediately prior to consummation of the event which results in the termination of the Plan as the Corporation shall designate, to exercise their options to the full extent not theretofore exercised.~~a Triggering Event, then the Corporation shall give notice to the Participant to such effect (the "Expiry Notice") not less than thirty days prior to the consummation of the Triggering Event which shall specify the Triggering Event and the closing date of the Triggering Event (the "Expiry Date"). Upon receipt of an Expiry Notice an Participant

7

shall immediately thereafter be entitled to exercise all options outstanding and previously unexercised, regardless of whether such Participant would otherwise be entitled to exercise such options to such extent at that time and such exercise shall be conditional upon the closing of the Triggering Event. To the extent that options have not been so conditionally exercised and all monies due to the Corporation as a result of such exercise have not been received by the Corporation prior to the Expiry Date, then such options shall thereafter expire and be void PROVIDED THAT if the Triggering Event does not close on the Expiry Date specified in the Expiry Notice, or any amendment thereto, then the options shall not terminate pursuant to this subparagraph, the options shall be deemed not to have been exercised and all monies conditionally received by the Corporation shall forthwith be returned to the Participant, without interest, and the provisions of this subparagraph shall continue to apply from time to time during the option period.

Adjustments under this Section shall be made by the Board or the Committee, as applicable, whose determination as to what adjustments shall be made, and the extent thereof, shall be final, binding and conclusive. No fractional share shall be issued under the Plan on any such adjustment.

17. **Transferability**

All benefits, rights and options accruing to any Participant in accordance with the terms and conditions of the Plan shall not be transferrable or assignable unless specifically provided herein. During the lifetime of a Participant any benefits, rights and options may only be exercised by the Participant.

18. **Amendment and Termination of Plan**

~~Subject to applicable regulatory approval, the Board may, at any time, suspend or terminate the Plan. Subject to applicable regulatory approval, the board may also at any time amend or revise the terms of the Plan, PROVIDED that no such amendment or revision shall alter the terms of any options theretofore granted under the Plan~~The Board, or the Committee, as applicable, may at any time or from time to time, in its sole and absolute discretion, amend, suspend, terminate or discontinue the Plan and may amend the terms and conditions of options granted pursuant to the Plan, subject to any required approval of any regulatory authority or stock exchange. Any amendment to the Plan at any time may not materially and adversely affect any option previously granted to a Participant without the consent of the Participant, except to the extent required by law. Any such amendment shall be subject to the receipt of requisite regulatory approval including, without limitation, the approval of any stock exchange upon which the shares of the Corporation may trade from time to time, provided, however, that no such amendment may: (i) increase the maximum number of shares that may be optioned under the Plan; (ii) increase the maximum number of shares which maybe reserved for issuance to insiders pursuant to the exercise of options granted under the Plan together with any other security based compensation arrangements of the Corporation as set forth in Section 4 hereof; or (iii) change the manner of determining the minimum exercise price, unless shareholder and regulatory approval is obtained. Any amendments to the terms of an option under the Plan shall also require regulatory approval, including without limitation, the approval of any stock exchange upon which the shares of the Corporation may trade from time to time. In addition, any amendment to the term of an option under the Plan which would extend the expiry date of an option held by an insider or amend the exercise price of an option held by an insider will require shareholder approval. For greater certainty, the Board, or the Committee, as

8

applicable, may make the following amendments without seeking the approval of the shareholders of the Corporation:.

   a)   amendments to the Plan to rectify typographical errors and\or to include clarifying provisions for greater certainty;

   b)   amendments to the vesting provisions of a option or the Plan;

   c)   amendments to the termination provisions of a option or the Plan which does not entail an extension beyond the original expiry date thereof unless the amendment extends the expiry date of an option held by an insider;

   d)   amendments necessary to comply with applicable law or the requirements of any stock exchange on which the common shares of the Corporation are listed;

   e)   amendments to the exercise price (which exercise price must comply with the provisions of Section 8 hereof) unless such amendment would benefit insiders of the Corporation; and

   f)   the inclusion of cashless exercise provisions in the Plan or in any option granted hereunder, which provide for a full deduction of the number of underlying securities from the Plan reserve.

19. **Necessary Approvals**

The ability of the options to be exercised and the obligation of the Corporation to issue and deliver shares in accordance with the Plan is are subject to any approvals which may be required from the shareholders of the Corporation and, any regulatory authority or stock exchange having jurisdiction over the securities of the Corporation. If any shares cannot be issued to any Participant for whatever reason, the obligation of the Corporation to issue such shares shall terminate and any option exercise price paid to the Corporation will be returned to the Participant.

Options issued to residents of the United States may only be issued and subsequently exercised in conformity with the registration provisions of the *Securities Act of 1933*, as amended the rules and regulations thereto and the applicable state securities laws.

~~20.   Creation of Share Option Schemes~~

~~To comply with the requirements of UK Inland Revenue and other regulatory authorities, the Board has the authority to create and adopt share option schemes, which terms and conditions are within the scope of the provisions of the Plan, and grant stock options to directors, management, consultants, employees of the Corporation and of its subsidiary and affiliates and Management Company Employees pursuant to such schemes.~~

2120. **Plan not Exclusive**

The Plan is not intended to be, and shall not be deemed to be a substitute for any other deferred compensation or bonus plans of the Corporation (or any of its subsidiaries or affiliates) or any other plan,

9

practice or arrangement for the payment of compensation or fringe benefits, that may now or hereafter be in effect for those eligible for stock options (as set forth in Section 7 hereof) generally or any group or class of those eligible for grants of stock options, and any such plan, practice or arrangement may be continued or ~~authorised~~ authorized and payment thereunder made independently of the Plan.

~~22~~21.   **Stock Exchange Rules**

All options granted pursuant to this Plan shall be subject to the rules and policies of any stock exchange or exchanges on which the shares of the Corporation are then listed and any other regulatory body having jurisdiction.
~~The rules of any stock exchange or stock exchanges upon which the Corporation's shares are listed or other regulatory body having authority shall be applicable relative to options granted to Participants.~~

~~23~~22.   **Effective Date of Plan**

The Plan has been adopted by the Board, or the Committee, as applicable, subject to the approval of any stock exchange on which the shares of the Corporation are ~~to be~~ listed or other regulatory body having jurisdiction and, if so approved, the Plan shall become effective upon such approvals being obtained.

~~24~~23.   **Interpretation**

The Plan will be governed by administered and construed in accordance with the laws of ~~Canada and of the Province of Alberta.~~ the Province of Alberta and the laws of Canada applicable therein.

**IN WITNESS WHEREOF** the Corporation has caused its corporate seal to be affixed hereto in the presence of its officer duly authorized in that behalf as of the 19th day of March, 2008.

**FRANCONIA MINERALS
CORPORATION**


Per:  *"BONNIE L. KUHN"*    
_____Bonnie L. Kuhn, Vice-President and
Secretary

10



# Franconia Minerals
## C O R P O R A T I O N

111 E. Magnesium Road, Suite A
Spokane, WA 99208
E-mail: franconia@franconiaminerals.com
Tel: (509) 340 1328
Fax: (509) 696 9680

March 6, 2008

**VIA FACSIMILE**
William Rowell
955 Ringwood Road North
Lake Forest, IL 60045
U.S.A.

Dear Sir:

**Re:    Stock Options**

We acknowledge the receipt of your notification to exercise 70,000 options to acquire 70,000 common shares of Franconia Minerals Corporation (the "Corporation") at a exercise price per share of Cdn $0.40 represented by an option agreement dated August 19, 2004 (the "Option Agreement". Please be advised that your options have expired pursuant to section 3.2 of the Option Agreement. On March 4, 2007 you advised the Corporation that you were terminating your services under your consulting agreement with the Corporation. Thus, pursuant to the Option Agreement, your options expired 90 days from the end of the 30 day termination notice period called for in Section 8 of the consulting agreement. The options covered by the Option Agreement dated November 23, 2006 have also expired pursuant to the same provision found in that agreement.

Yours truly,

**Brian Gavin, President and CEO**
**FRANCONIA MINERALS CORPORATION**

LAW OFFICES OF KEITH L. DAVIDSON

ATTORNEYS AT LAW

TWO NORTH LA SALLE STREET

SUITE 1600

CHICAGO, ILLINOIS 60602

(312) 419-0544

Fax: (312) 419-0758   email: KeithDavidson@kldlawoffices.com

Keith L. Davidson
———
Of Counsel:
Martin J. Oberman
Steven J. Rizzi

**BY FEDERAL EXPRESS**
April 10, 2008

Mr. Brian Gavin
President, Franconia Minerals Corporation
111 E. Magnesium Road, Suite A
Spokane, WA 99208

Re:   *Rowell v. Franconia Minerals Corporation*

Dear Mr. Gavin:

I represent William Rowell in his claim for money damages against Franconia Minerals Corporation as set forth in the enclosed action filed today in the Circuit Court of Cook County, Illinois for breach of the Consulting Agreement between Mr. Rowell and Franconia.

Formal Service on Franconia of the complaint and summons will follow promptly in the manner prescribed by law.  This letter is simply to provide Franconia a courtesy copy in advance of its forthcoming shareholders meeting in the event Franconia may have an interest in attempting to achieve a speedy resolution of the dispute that might require deliberation or approval by Franconia's board or shareholders before or during the meeting.

Mr. Rowell firmly believes that his claims are meritorious but appreciates that, if the dispute must be litigated, it will be increasingly time-consuming and costly to both parties and, therefore, he is open to trying, if possible, to resolve it amicably.

If Franconia Minerals Corporation is likewise so disposed and wishes to explore the possibility of a negotiated settlement, you may have your counsel contact me for that purpose.  Legal cannons of ethics preclude me from dealing directly with you and your counsel from dealing directly with Mr. Rowell.  Alternatively, you or another non-lawyer representative of Franconia's Board may contact Mr. Rowell directly for this purpose without participation of any counsel.  However, I have advised Mr. Rowell that, if he is contacted directly for this purpose, he should confine the discussion to negotiation of numbers and refrain from any discussion of the facts or merits of the dispute.  If a settlement is negotiated, formal papers will need to be drafted by counsel to implement it and dispose of the litigation.

If reasonable progress toward a settlement is demonstrated prior to the time Franconia is required to appear and file a responsive pleading in the case, I will agree to a reasonable extension of the time for Franconia to appear and file a responsive pleading so as to allow an opportunity for a resolution to be achieved before Franconia is put to its defense.

Very truly yours,

Keith L. Davidson

Encl.

KLD:jhg

cc:    William Rowell (by e-mail)

       Bonnie Kuhn (By Federal Express)
       Counsel to Franconia Minerals Corporation
       407 2nd Street S.W.
       Calgary, Alberta, T2P 2Y3
       Canada